**OLYMPIC FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**
v.
**DIRECTOR, OFFICE OF THRIFT SUPERVISION, et al.,**
**Defendants.**

**Civ. A. No. 90–0482 (RCL).**

United States District Court,
District of Columbia.

March 21, 1990.

Charles J. Cooper, McGuire, Woods, Battle & Boothe, Washington, D.C., for Olympic Federal Sav. and Loan Assn.

Aaron B. Kahn, Office of Chief Counsel, Office of Thrift Supervision, Washington, D.C., for Director, Office of Thrift Supervision and Salvatore R. Martoche.

Leslie H. Southwick, Steve Frank, Mona B. Alderson, Dept. of Justice, Civ. Div., for FDIC.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiff Olympic Federal Savings & Loan Association ("Olympic") filed a motion on March 6, 1990, requesting that the court issue a temporary restraining order ("TRO") and a preliminary injunction ("PI") enjoining the Director of the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC") from appointing a conservator or receiver for Olympic. Plaintiff argues the following in support of its motion: first, that both M. Danny Wall, the previous Director of OTS, and Salvatore R. Martoche, the current Acting Director of OTS, were unconstitutionally appointed and therefore have no legal authority to appoint a conservator or receiver; second, that the regula-

tions issued by OTS changing the capital requirements for savings and loans ("S & Ls") were issued in violation of the Administrative Procedure Act's notice and comment requirements and therefore cannot serve as the basis for appointing a conservator or receiver; and third, that the grounds for appointing a conservator or receiver do not exist until the FDIC has reviewed and acted upon Olympic's request for assistance. The court need not address Olympic's second and third arguments at this time because, for the reasons discussed herein, the strong likelihood that Olympic will succeed on the merits of its Appointments Clause challenge alone entitles Olympic to the limited injunction it requests.

## I. *Factual Background.*

In the late 1970's and early 1980's, the thrift industry was undergoing a crisis of unprecedented magnitude. High interest rates forced most thrifts to pay out more in interest on deposits than they earned on their portfolio of long-term, fixed-rate mortgages. This interest rate spread drove many thrifts into insolvency. Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction (filed Mar. 6, 1990) ("Plaintiff's Initial Memorandum"); *see also* Defendant FDIC's Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order at 2, 4–5 (filed Mar. 6, 1990) ("FDIC's TRO Opposition").

The thrift industry was regulated at the time by the Federal Home Loan Bank Board ("FHLBB") and its insurance arm, the Federal Savings and Loan Insurance Corporation ("FSLIC"). Faced with a large number of failing thrift institutions, the FSLIC and FHLBB recognized that the FSLIC insurance fund would quickly be exhausted if the government continued to provide financial assistance to all troubled thrifts. Plaintiff's Initial Memorandum at 3; *see also* FDIC's TRO Opposition at 5. In mid–1981, the FSLIC and FHLBB therefore revised their policies and practices to prevent, or at least forestall, the exhaustion of the FSLIC insurance fund. Plaintiff's Initial Memorandum at 3. They be-

gan inducing and arranging supervisory mergers by providing assistance in the form of an intangible asset—"supervisory goodwill"—rather than in the form of cash. *Id.*

This was accomplished by allowing thrifts to account for mergers using the "purchase method" of accounting. *Id.* Under this method, the book value of the assets and liabilities of an acquired thrift were adjusted ("marked to market") to their fair market value at the time of the acquisition. *Id.* at 4. The excess in the cost of the acquisition (including any liabilities assumed by the acquirer) over the fair market value of the acquired assets was then separately recorded on the acquiring thrift's books as "goodwill"—an intangible, non-earning asset subject to amortization on a straight-line basis over as many as 40 years. *Id.* FHLBB's regulations governing the minimum capital requirements for FSLIC-insured thrifts allowed thrifts to include "supervisory goodwill" in capital. *Id.* at 4–5.

Olympic is the product of a number of mergers consummated between 1982 and 1984. *Id.* at 7–13. Olympic booked more than $160 million in supervisory goodwill as a result of these mergers. *Id.* at 13. After the mergers had been completed, Olympic's tangible capital level was a negative $140 million, or negative 25.75 percent of total assets. *Id.* at 14. Since 1984, Olympic has amortized more than $43 million of its supervisory goodwill. *Id.*

The thrift industry's problems did not disappear when interest rates began declining in late 1982. Indeed, when President Bush took office in January of 1989 the S & L industry remained in a "crisis" situation. President Bush made the S & L crisis a top priority of his new administration. FDIC's TRO Opposition at 5. He submitted to Congress a bill proposing a major restructuring of the way in which the federal government regulates the savings and loan industry. The bill was approved by Congress and on August 9, 1989, President Bush signed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") into law. Plaintiff's Initial Memorandum at 15.

FIRREA dramatically changed the regulatory regime which oversees the S & L industry. It abolished the FHLBB and FSLIC and established a new agency—OTS—as an office in the Department of the Treasury. *Id.* at 15; FDIC's TRO Opposition at 6. It divided regulatory and insurance responsibilities between OTS (the regulator) and the Savings Association Insurance Fund ("SAIF") (the insurer). Defendant Director, Office of Thrift Supervision's Memorandum in Opposition to Temporary Restraining Order at 3 (filed Mar. 6, 1990) ("OTS' TRO Opposition"); FDIC's TRO Opposition at 5–6. It removed from OTS certain powers previously exercised by the FHLBB, but placed OTS in the hands of a single Director rather than a three-person board. OTS' TRO Opposition at 4. It vested in the Director responsibility for issuing S & L charters, reviewing proposed changes in control of thrifts, supervising and regulating federally-insured thrifts, and appointing receivers and conservators for ailing thrifts and their officers. Defendant Director's Opposition to Motion for Preliminary Injunction at 4 (filed Mar. 13, 1990) ("OTS' PI Opposition").

FIRREA provides that the Director of OTS shall be appointed by the President, by and with the advice and consent of the Senate, for a term of five years. FIRREA § 301, 103 Stat. 278. FIRREA also provides that vacancies in the office of Director which occur before the expiration of a term shall be filled by the President, by and with the advice and consent of the Senate. *Id.* However, FIRREA contains a "grandfather" clause pursuant to which the Chairman of the FHLBB on the date of FIRREA's enactment was statutorily appointed OTS' first Director. *Id.* By operation of this provision, M. Danny Wall became OTS' first Director. Plaintiff's Initial Memorandum at 16.

Under Mr. Wall's leadership, OTS promulgated new capital regulations in accordance with FIRREA's provisions. *Id.* at 19; FDIC's TRO Opposition at 8–9. The new capital regulations permit thrifts to include "supervisory goodwill" only to meet "risk-based" capital requirements and only in accordance with a phase-out schedule set forth in FIRREA. Plaintiff's Initial Memorandum at 20.

Olympic does not comply with the new capital requirements. *Id.* at 23. It is currently operating subject to a number of business restrictions imposed by OTS. *Id.* at 24. Moreover, because Olympic does not meet the new capital requirements, the Director has statutory authority to take over the thrift by appointing a conservator or receiver and, if necessary, to direct that person to liquidate the thrift. *Id.*

Recognizing the threat to its continued operations and believing that various statutory, constitutional and other grounds existed upon which it could challenge OTS' acts, Olympic filed its complaint in this case on March 1, 1990. Among other things, Olympic alleged that M. Danny Wall, then Director of OTS, had been unconstitutionally appointed. Complaint, at ¶ 61. Contemporaneously with filing its complaint, Olympic advised counsel for defendants that it intended to challenge the constitutionality of Mr. Wall's appointment. Supplemental Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, at 2 (filed Mar. 9, 1990) ("Plaintiff's Supplemental Memorandum"). On March 5, 1990, Mr. Wall ceased to be Director of OTS and the President appointed Salvatore Martoche Acting Director of OTS pursuant to the Vacancies Act, 5 U.S.C. §§ 3345–49. OTS' TRO Opposition at 9.

On March 6, 1990, after OTS had refused to assure Olympic that it would not appoint a receiver or conservator and had refused to agree to provide Olympic with notice of its intent to appoint a receiver or conservator, Olympic filed its motion for a TRO and for a PI. Plaintiff's Supplemental Memorandum at 2. Defendants argued in opposition that plaintiff's Appointments Clause challenge had been mooted by Mr. Wall's resignation and that, in any event, plaintiff was not entitled to the extraordinary relief it requested. At oral argument on its motion for a TRO, Olympic countered by arguing that Salvatore Martoche's designation as Acting Director under the Vacancies Act was improper, and that therefore Mr. Wall's resignation had not mooted its Ap-

pointments Clause claim. After considering the briefs filed on behalf of all parties and hearing oral argument on Olympic's motion, the court granted Olympic's request and enjoined the Acting Director of OTS from appointing a receiver or conservator for Olympic for ten days, unless he first provided the court and plaintiff's attorney with six hours' notice of his intent to appoint a receiver or conservator. On March 13, after further briefing by the parties, the court heard oral argument on Olympic's motion for a preliminary injunction. For the reasons discussed herein, and pursuant to an order issued this date, the court now grants Olympic's motion for a preliminary injunction prohibiting the Acting Director of OTS or any officer at OTS from appointing a receiver or conservator for Olympic until a new Director of OTS has been nominated by the President and confirmed by the Senate.

## II. *Analysis.*

### A. Ripeness, Standing, and Jurisdiction.

Before the court can reach the merits of Olympic's claim, it must decide whether Olympic's claim is ripe, whether Olympic has standing to challenge the appointments of Mr. Wall and Mr. Martoche, and whether FIRREA precludes this court from hearing Olympic's case.

### 1. *Ripeness.*

■ Defendant OTS asserts that the Acting Director has not made any decision to appoint a receiver or conservator for Olympic. Indeed, according to OTS it is possible that the Director will *never* decide to appoint a receiver or conservator for Olympic. As a result, OTS contends, Olympic's challenge is premature.[1]

The court can not reasonably conclude that plaintiff's harm is not sufficiently imminent and concrete to make its claim ripe.

"[B]oth the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" show that this case merits immediate review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). On the claim currently before the court, Olympic does not challenge a regulation which may never be applied to it or ask the court to intervene in the Director's substantive decision whether or not to appoint a receiver or conservator for Olympic.[2] Rather, Olympic challenges the Acting Director's constitutional authority to act as Director and asks the court to enjoin him from taking a specific and apparently imminent act. The disagreement over Mr. Martoche's legal status is not "abstract," but focuses on legal issues which are clear and events which have already taken place. *Cf. Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515 (Supreme Court found case was ripe for adjudication because it presented a purely legal issue and because no further administrative proceedings were contemplated). In addition, plaintiff would suffer serious hardship if this court refused to hear its claim. OTS has made clear that—absent an injunction—*at any moment* and *with no notice* to either plaintiff or to the court it may appoint a receiver or conservator, instruct him or her to take control of Olympic's operations, and perhaps begin liquidating the thrift. Once a receiver or conservator is appointed, this court's power to enjoin the receiver or conservator's actions or to remedy any injury to Olympic would be severely restricted. *See* FIRREA § 301, 103 Stat. 292 (restricting court's authority to enjoin acts of receiver or conservator); *Andrade v. Lauer,* 729 F.2d 1475, 1496–97 (D.C.Cir.1984) (*de facto* officer doctrine limits court's ability to undo prior acts). In light of these facts,

1. The court notes that the factual premise for OTS' ripeness argument is seriously undercut by its claim that, "[i]n view of Olympic's precarious financial condition, *even a temporary restraint* of the Director's authority *would pose a grave threat* to the public, the federal insurance fund, and the savings and loan industry as a whole." OTS' TRO Opposition, at 41 (emphasis added). If even a temporary restraint poses such a grave threat, presumably there is a strong likelihood that the appointment of a conservator or receiver is imminent.

2. This fact distinguishes the other cases cited by OTS and make clear that its exhaustion argument, OTS' TRO Opposition, at 11 n. 7, is misplaced.

the court concludes that Olympic's claim is ripe for judicial consideration.[3]

### 2. *Standing.*

Defendant FDIC next argues that Olympic lacks standing for two reasons: first, that Olympic lacks Article III standing because its injury—if one exists—will not be redressed by a decision that OTS' two Directors were unconstitutionally appointed; and second, that Olympic lacks prudential standing because it is not within the zone of interests that Congress intended a private party to assert.

#### a. Article III Standing.

 In order to establish standing to challenge a particular act or policy, a litigant must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

According to the FDIC, Olympic fails to satisfy this test because plaintiff's injury, if any exists, is not likely to be redressed by a favorable decision on its constitutional claim. Defendant FDIC's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction at 3 (filed Mar. 13, 1990) ("FDIC's PI Opposition"). Defendant alleges that plaintiff's ultimate difficulty is its failure to meet legislatively mandated capital standards which must be imposed by whomever is at the head of OTS. *Id.* Defendant contends that "[p]laintiff's grievance, at bottom, is a fundamental quarrel with Congress' strict mandate of minimum thrift capital," and

that "[c]hallenges to the specific officer entrusted to implement that mandate beg the question of the source of plaintiff's ultimate injury—the United States Congress." *Id.* at 4. The FDIC concludes that because resolution of the Appointments Clause issue will not affect Olympic's failure to meet the capital requirements or relieve it from the threat of government intervention, Olympic lacks Article III standing.

Defendant's argument ignores a critical element of plaintiff's claim. In the end, plaintiff clearly hopes to avoid having a conservator or receiver appointed for it. However, this is not all plaintiff seeks. Part of plaintiff's claim is that, under the Constitution and laws of the United States, it is subject to regulation *only* by individuals with legal authority to act. If this court attempted to appoint a conservator or receiver pursuant to FIRREA, plaintiff clearly could complain that this court has no authority to take such action, for even if grounds for appointment exist, this court simply has no right to exercise the Director's appointment power. This is the essence of plaintiff's constitutional claim: because Mr. Martoche was not properly appointed, he has no more right to exercise the Director's appointment powers than this court does. And this is the injury which a finding for plaintiff on its constitutional claim would redress: the injury which any citizen suffers when its government acts unconstitutionally against it. Even if a receiver or conservator ultimately is appointed, success on plaintiff's constitutional claim would protect its right to demand that those who act against it on behalf of the government do so both lawfully and constitutionally. *See Andrade*, 729 F.2d at 1496 (in many procedural due process cases, graveman of complaint is that government must act in accord with due process principles when it takes action

---

**3.** OTS' argument, though framed in ripeness terms, could also be considered a challenge to Olympic's standing. The same facts which cause this court to believe that adjudication of this lawsuit is not premature cause the court to conclude that Olympic faces a sufficiently direct

and imminent threatened harm to have standing. *See Andrade*, 729 F.2d at 1495 (plaintiff has standing if it can assert that it has sustained or is immediately in danger of sustaining a direct injury).

against citizens even if conformance may not change substantive outcome).

The FDIC's argument is flawed for a second reason. According to defendant, it does not really matter who is in the office of Director: Congress has mandated minimum capital requirements, Olympic fails to meet those requirements, and therefore any person acting as Director is equally likely to appoint a conservator or receiver for Olympic. This argument asks the court to assume that both FIRREA's grant of discretion to the Director and the protections conferred by the Constitution are meaningless, for although both affect the process by which the outcome is reached, neither affects the ultimate outcome. The court can not and will not accept this proposition. The court *can not* accept it because the court is bound by the Court of Appeals' decision in *Andrade,* 729 F.2d at 1495–96, which explicitly rejects the claim that one cannot maintain an Appointments Clause challenge unless one can show that, had the Constitution's requirements been followed, the outcome would have been different. The court *will not* accept it because the court absolutely rejects the proposition that the procedural protections conferred by various statutes and by the Constitution are nothing more than hollow gestures at the appearance of democracy. The Appointments Clause subjects the selection process to public scrutiny, thereby affecting who takes office, how they perceive their function, and how they exercise their powers. *See Andrade,* 729 F.2d at 1495 and n. 35 (Appointments Clause gives Congress some control over Executive Branch, within framework of system of checks and balances).

In light of the foregoing, the court concludes that a favorable decision on plaintiff's constitutional question will redress at least one of plaintiff's threatened injuries. The court therefore finds that plaintiff has Article III standing.

### b. Prudential Standing.

■ Defendant FDIC also claims that this court should refuse to hear plaintiff's case on "prudential standing" grounds because plaintiff has not demonstrated that it is within the zone of interests that Congress intended a private party to assert. FDIC's PI Opposition at 4–8. It states that "Congress could not logically have intended to allow a private party to have standing to assure anything more than that the officer who acts in its regard acts with the independent authority of the Executive Branch and with prior concurrence of the Senate for this position." *Id.* at 5. The court rejects this claim as well.

The Vacancies Act makes clear that Congress is concerned with more than ensuring that only confirmed officers act on behalf of the government. The Vacancies Act allows only confirmed officers to be designated as acting officials; however, it also places strict time limits on the life of a Vacancies Act designation. If the government were correct and the Vacancies Act sought only to assure that acting officers had undergone a confirmation process, presumably Congress would have written a much more generous time limit into the Vacancies Act.

The government also claims that only legislators should be granted standing to challenge unconstitutional appointments. FDIC's PI Opposition at 7. This argument ignores the Constitution's basic purpose. Although the Senate clearly has a strong interest in protecting its role in the confirmation process, the Constitution was not written to protect the interests of the Senate, the Congress, the President, or any other branch or division of government. The Constitution and its system of checks and balances was written to protect the people. The restrictions it placed upon the branches' exercise of power were not designed to ensure the branches' interest in equal power, but to ensure that citizens would not find themselves governed by a single branch which had swept all the government's power into its domain. Thus, entities which will be directly harmed by unconstitutional appointments clearly fall within the zone of interests which the Appointments Clause and the entire system of checks and balances was designed to pro-

tect.[4] These entities are routinely permitted to challenge unconstitutional appointments. *See Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986) (Union members who would not receive scheduled increase in benefits have standing to challenge Balanced Budget and Emergency Deficit Control Act of 1985 on ground that it includes unconstitutional appointment provision); *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893) (affected landowner has standing to challenge appointment of Rock Creek Park commission members); *Andrade,* 729 F.2d at 1494 (employees subject to RIF have standing under both constitutional and prudential standing doctrines to challenge appointment of officials responsible for RIF).

For the foregoing reasons, the court concludes that plaintiff has Article III standing to raise its constitutional challenge and that the court should not refuse to hear plaintiff's claim on prudential grounds.

### 3. *Jurisdiction.*

■ Defendants' third challenge is that this court does not have jurisdiction to adjudicate plaintiff's claim or grant plaintiff the relief it requests. According to OTS, FIRREA explicitly prohibits federal district courts from reviewing the Director's decision to appoint a receiver or conservator before the fact and prohibits a district court from enjoining the appointment of a conservator or receiver. OTS' PI Opposition at 3–4; OTS' TRO Opposition at 12–19.

FIRREA provides in pertinent part that:
(E) The Director shall have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association. If, in the opinion of the Director, a ground for the appointment of a conservator or receiver for a savings

association exists, the Director is authorized to appoint *ex parte* and without notice a conservator or receiver for the savings association. In the event of such appointment, the association may, within 30 days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located, or in the United States District Court for the District of Columbia, for an order requiring the Director to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Director to remove such conservator or receiver. Upon the commencement of such an action, the court having jurisdiction of any other action or proceeding authorized under this subsection to which the association is a party shall stay such action or proceeding during the pendency of the action for removal of the conservator or receiver.

. . . . .

(G) Except as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or receiver or, except at the request of the Director, to restrain or affect the exercise of powers or functions of a conservator or receiver.

FIRREA § 301, 103 Stat. 292.

OTS' entire argument on this issue fails to recognize the essence of plaintiff's claim. Olympic does not challenge the *grounds* upon which the Director will appoint a receiver or conservator; Olympic challenges the Director's constitutional authority to appoint a receiver or conservator.[5] Whether or not the above-quoted passages remove from federal district courts the power to hear pre-appointment challenges on the merits,[6] nothing in these pas-

---

**4.** The court need not here decide whether so-called congressional standing, an apparent creature solely of the D.C. Circuit, ever exists.

**5.** Although plaintiff's other claims may attack the merits of the Director's decision to appoint, plaintiff's constitutional claim clearly does not. Because the court is relying solely on plaintiff's constitutional claim in granting plaintiff's motion for preliminary injunction, only plaintiff's

constitutional claim is relevant in deciding whether FIRREA removed jurisdiction from this court.

**6.** Contrary to defendant's assertion, FIRREA does not appear to prohibit pre-appointment review. Subsection G by its terms only prohibits the courts from removing or restraining an appointed conservator; it simply does not speak to pre-appointment actions. Similarly, the legis-

sages limits a district court's power to hear a preappointment claim which challenges the Director's constitutional power to appoint a receiver or conservator. As the Court of Appeals for this Circuit has recognized, "Congress has given ... an awesome amount of control and authority to the [Director]." *Haralson v. Federal Home Loan Bank Bd.*, 837 F.2d 1123, 1127 (D.C.Cir.1988) (quoting *Biscayne Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 720 F.2d 1499, 1503 (11th Cir. 1983)). In light of that awesome authority and the irreparable injury Olympic will suffer if it is not allowed to challenge Mr. Martoche's authority until after an appointment is made, *see* pp. 1200–01, *infra*, it is proper to hear plaintiff's claim at this time. Nothing in FIRREA makes this improper or beyond this court's authority.

Because plaintiff's challenge is ripe, because Olympic has standing to challenge Mr. Martoche's constitutional authority to act as Director of OTS, and because nothing in FIRREA removes this court's general jurisdiction to hear an Appointments Clause challenge, the court may reach the merits of plaintiff's request for preliminary injunctive relief.

**B. Plaintiff's Right to Injunctive Relief.**

In deciding whether to issue a preliminary injunction, a trial court should consider (1) the plaintiff's likelihood of success on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of injunctive relief, (3) the possibility of substantial harm to other interested parties from the injunctive relief, and (4) the public

interest. *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir.1985) (citing *WMATC v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C.Cir.1977)); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir.1958).

**1. *Plaintiff's Likelihood of Success on the Merits.*[7]**

Plaintiff argues that both the previous OTS Director, M. Danny Wall, and its current Acting Director, Salvatore R. Martoche, were appointed in violation of the Constitution's Appointments Clause. As a result, plaintiff contends that Mr. Martoche may not constitutionally exercise the authority, conferred upon the Director by FIRREA, to appoint a conservator or receiver for it. Defendants respond with four arguments: first, that Mr. Wall's appointment as Director of OTS did not require re-confirmation; second, that Mr. Martoche's designation under the Vacancies Act was proper even if Mr. Wall never constitutionally became OTS' Director; third, that the President had the inherent constitutional authority to designate Mr. Martoche as Acting Director even if he did not have statutory authority to do so; and finally, that Mr. Wall and Mr. Martoche validly delegated their powers to others while acting as *de facto* officers and that therefore those delegated officials may appoint a receiver or conservator even if Mr. Martoche cannot.

**a. Mr. Wall's Appointment.**

█ The Appointments Clause of the Constitution provides that:

---

lative history cited by OTS limits only the jurisdiction "to order the *removal* of a conservator or receiver," OTS' TRO Opposition, at 15, and all of the cases cited by OTS involve post-appointment review. *See, e.g., Yorkridge Calvert Savings and Loan Association v. Office of Thrift Supervision*, C.A. No. B–89–3443, 1989 WL 161554 (D.Md.1990) (refusing TRO where receiver had already been appointed); *Haralson v. Federal Home Loan Bank Bd.*, 837 F.2d 1123 (D.C.Cir.1988) (upholding District Court's refusal of injunction to prevent already appointed conservator from selling plaintiff's assets); *Biscayne Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 720 F.2d 1499, 1500 (11th Cir. 1983) (reversing District Court's grant of limited

injunctive relief against an already appointed receiver), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).

7. OTS states that to demonstrate a reasonable likelihood of success on the merits Olympic "must demonstrate that it will probably succeed in proving on the merits that *none* of the statutory grounds for appointing a conservator or receiver exist." OTS' TRO Opposition, at 21 (emphasis in original). This is incorrect. As to plaintiff's *constitutional* claim, it must show that Mr. Martoche cannot appoint a receiver or conservator, not that no properly appointed officer could appoint a receiver or conservator. *Cf.* pp. 1188–89, *supra*.

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art II, § 2, cl. 2. As an officer of the United States, the Director of OTS—like "any [other] appointee exercising significant authority pursuant to the laws of the United States"—must be appointed in the manner prescribed by the Constitution's Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976).[8]

Mr. Wall was appointed as OTS' initial Director by operation of section 301 of FIRREA, which provided that the Chairman of the FHLBB on the date FIRREA became effective would become OTS' initial Director and would serve as Director until his term as chairman of the FHLBB would have expired. FIRREA § 301, 103 Stat. 278. Thus, Mr. Wall clearly was not appointed in the manner specified by the Constitution. The government contends, however, that Mr. Wall's responsibilities as Director of OTS were essentially identical to (although more limited than) his responsibilities as Chairman of the FHLBB. The government concludes that therefore Mr. Wall's "appointment" as Director did not require re-nomination and reconfirmation. FDIC's PI Opposition at 29–38 (citing *Shoemaker*, 147 U.S. at 282, 13 S.Ct. at 361).

In *Shoemaker*, a landowner challenged the act creating Rock Creek Park in Washington, D.C. The act created a commission to select the land for the park, to arrange to have the land surveyed, to determine the amount of compensation due landowners whose land was taken for the park, and to perform certain other duties. *Id.* at 284–86, 13 S.Ct. at 363–64. The heirs of one of the persons whose land was to be included in the park sought to prevent the land from being taken by raising a number of challenges to the constitutionality of the act and to the validity of proceedings under the act. *Id.* at 288, 13 S.Ct. at 364. Among other things, they challenged a provision in the act which directed that the Chief of Engineers of the United States Army and the Engineer Commissioner of the District of Columbia would serve as two of the five commission members. *Id.* at 284, 289, 300–01, 13 S.Ct. at 363, 365, 391. They argued that, "while Congress may create an office, it cannot appoint the officer; ... the officer can only be appointed by the President with the approval of the Senate...." *Id.* at 300, 13 S.Ct. at 391.

The Court rejected this argument, holding that:

As, however, the two persons whose eligibility is questioned were at the time of the passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that *Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed.*

*Id.* at 301, 13 S.Ct. at 391 (emphasis added).

The *Shoemaker* case is distinguishable from this case in two important respects. First, the provision challenged in *Shoemaker* added certain duties to two *offices;* it did not confer additional responsibilities on any particular *officer.* Had the Chief of Engineers of the United States Army or the Engineer Commissioner of the District

---

**8.** The government has never contended that the Director is not an officer subject generally to the Appointments Clause. Given the Director's broad discretion to regulate an entire industry and his freedom from intervention by higher-level Executive department officers, any such argument would clearly be wrong.

of Columbia resigned from office after the commission was established, he would no longer have served on the commission—the new Chief of Engineers or Engineer Commissioner would have taken over those duties. Here, however, Mr. Wall was designated the new Director of OTS. Although the position was given to him by virtue of his prior position, it was given to *him*.

Another important fact distinguishes this case from *Shoemaker*. In *Shoemaker* and the cases which have relied on its reasoning, *see* FDIC's PI Opposition at 33–34, the duties of one office were supplemented or were transformed. Service on the Rock Creek Park commission became an additional duty of the Chief of Engineers of the Army; the Secretary of Health, Education and Welfare became the Secretary of Health and Human Services. Here, however, two members of the Federal Home Loan Bank Board were removed by operation of FIRREA, and only the third had his responsibilities transferred to OTS. Had OTS been placed under the supervision of a three-person board, this court believes that the government's argument would be correct and that the three former FHLBB members would not have required re-confirmation. However, when Congress decided that only one of the three FHLBB members would have his responsibilities transferred and, moreover, decided specifically which of the three would become the new Director, it went beyond simply changing the duties of an office and appointed a *person* to a new post. This difference makes *Shoemaker* inapposite.

Although the Supreme Court's decision in *Bowsher*, 478 U.S. at 714, 106 S.Ct. at 3181, is not controlling, its holding supports this limit on *Shoemaker*'s holding. In *Bowsher* the Court held that "[a] direct congressional role in the removal of officers charged with the execution of the laws ... is inconsistent with separation of powers." *Bowsher*, 478 U.S. at 723, 730, 106 S.Ct. at 3186, 3190. Congress clearly may abolish offices, thereby effectively removing the officers who hold those offices. Thus, the situation presented herein does not directly violate *Bowsher*'s mandate. However, when it abolished one agency and removed its three officers, yet designated one of the three as the head of the newly-created successor agency, Congress exercised the kind of decisionmaking about who will serve in Executive department posts that the Constitution says it cannot. Indeed, the closer the relationship between the functions of the FHLBB and OTS—and thus the more *Shoemaker* is applicable—the more serious the *Bowsher* problem.[9]

For the foregoing reasons, the court concludes that *Shoemaker* does not apply to the facts of this case. As a result, Mr. Wall required re-nomination and re-confirmation before he could constitutionally take office as OTS' Director. Since he was never re-nominated or re-confirmed, he never constitutionally took office.

b. Mr. Martoche's Appointment.

After this lawsuit was filed and the day after Mr. Wall's resignation became effective, the President issued the following order:

> In accordance with the provisions of section 3347 of title 5 of the United States Code, and as President of the United States, I hereby authorize and direct Salvatore R. Martoche, an Assistant Secretary of the Treasury (Enforcement), to perform the duties of the office of Director of the Office of Thrift Supervision for the maximum term permitted by 5 U.S.C. section 3348 or until confirmation and appointment of a Director of the Office of Thrift Supervision, whichever is sooner.

OTS' TRO Opposition, at Exhibit E (order directing Mr. Martoche to perform duties

---

**9.** It does not matter that FIRREA stated that the Chairman of the FHLBB—not Mr. Wall by name—would become OTS' initial Director. The constitutional problem is presented by the fact that Congress decided who would take over as OTS' Director and, whether it named that person by job title or by function, Congress named that person. Moreover, it does not matter that the President's proposed bill included a provision to make Mr. Wall OTS' initial Director. The President and the Congress, whether alone or together, cannot decide to circumvent the Constitution's requirements.

of Director). Mr. Martoche has been serving as Acting Director of OTS since March 5, 1990.

Olympic contends that the President's designation of Mr. Martoche as Acting Director pursuant to 5 U.S.C. § 3347 is improper. According to Olympic, section 3347 does not give the President authority to fill a vacancy caused by the resignation of any person other than a constitutionally appointed officer. Because Mr. Wall was never constitutionally appointed Director of OTS, Olympic concludes that his resignation does not fall within the scope of section 3347. The government responds with two arguments: first, that plaintiff's interpretation of section 3347 is incorrect and that Mr. Martoche's designation under that section was proper; and second, that even if the designation under section 3347 was improper, the designation was a proper exercise of the President's inherent powers.[10]

i. *Was Mr. Martoche Properly Designated Under the Vacancies Act?*

◼ In the Vacancies Act, Congress delegated to the President limited authority to temporarily fill certain vacancies. The Act, 5 U.S.C. § 3345 *et seq.*, provides in pertinent part:

§ 3346. When an officer of a bureau of an Executive department or military department, whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

⋅　　⋅　　⋅　　⋅　　⋅

§ 3347. Instead of a detail under section 3345 or 3346 of this title, the President may direct the head of another Executive department or military department or another officer of an Executive

department or military department, whose appointment is vested in the President, by and with the advice and consent of the Senate, to perform the duties of the office until a successor is appointed or the absence or sickness stops. This section does not apply to a vacancy in the office of Attorney General.

Olympic's argument, briefly stated, is as follows. Section 3347 provides an alternative way in which the President may fill vacancies under sections 3345 and 3346, but does not itself authorize the President to fill vacancies. Therefore, the President can fill a vacancy under section 3347 only if it is the type of vacancy described in section 3345 or 3346. Section 3345 applies when the head of an Executive agency (other than the General Accounting Office) or military department dies, is sick, or is absent, and thus is inapplicable in this case. Section 3346 applies "[w]hen an officer of a bureau of an Executive department or military department, whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent." Because Mr. Wall never constitutionally became an officer, his resignation does not constitute the resignation of "an officer of a bureau of an Executive department." As a result, neither section 3345 nor section 3346 authorized the President to temporarily fill the office of Director following Mr. Wall's resignation. Since the President lacked statutory authority to appoint Mr. Martoche and since the President did not appoint him in the manner specified by the Appointments Clause, Mr. Martoche's appointment is invalid and—like Mr. Wall before him—Mr. Martoche is without constitutional power to take any action as Director of OTS.

◼ The court, after careful review of the relevant statutes, historical references, and cases, has determined that plaintiff's interpretation is correct. Section 3347 is

---

**10.** Defendants initially stated that Mr. Martoche's designation was performed solely under the Vacancies Act. *See, e.g.,* OTS' TRO Opposition at 9, 24–25; OTS' PI Opposition at 2–3, 12. Moreover, neither defendant has proffered that the President did in fact intend to exercise his inherent powers when he appointed Mr. Martoche as head of OTS. However, since the defendant agencies have no authority to limit the President's exercise of his constitutional authority, the court will assume that the President intended his words "as President of the United States" to invoke any inherent appointment authority which he has.

by its terms available to the President "[i]nstead of a detail under section 3345 or 3346." Section 3346 by its terms gives the President authority to appoint an interim replacement "[w]hen an officer of a bureau of an Executive department ... dies, resigns, or is sick or absent." Although defendants contend that "officer" as used in section 3346 does not mean "constitutional officer," this court does not agree. 5 U.S.C. § 2104 provides in pertinent part that:

> (a) For the purpose of this title, "officer", except as otherwise provided by this section or when specifically modified, means ... an individual who is—
>> (1) required by law to be appointed in the civil service by one of the following acting in an official capacity—
>> (A) the President;
>> (B) a court of the United States;
>> (C) the head of an Executive agency; or
>> (D) the Secretary of a military department.

Section 3346 does not "otherwise provide" a meaning for the term "officer," and therefore pursuant to section 2104 this court must construe that term to mean "constitutional officer" (*i.e.,* an officer selected by the President with the advice and consent of the Senate or an officer whose appointment was delegated by Congress to the President alone, to the head of a department, or to the Judiciary). *See also* H.R. Rept. No. 1389, *Enactment of Title 5, United States Code, Entitled "Government Organization and Employees"*, 89th Cong., 2d Sess. 67–68 (1966) (in discussing changes made to 5 U.S.C. § 3332, committee stated that "[t]he term 'officer' is coextensive with and substituted for 'Each individual appointed hereafter as a civil officer of the United States by the President, by and with the advice and consent of the Senate, or by the President alone, or by a court of law, or by the head of a department' in view of the definition of 'officer' in section 2104.").

▮ The government argues that section 2104's definition of officer is forward looking. Focusing on the language which defines an officer as an individual "who is ... required by law *to be* appointed," the government contends that section 2104 does not require that the resigning officer *was* appointed, just that he was *required to have been* appointed. Thus, the government concludes, section 2104 does not require that Mr. Wall's appointment was constitutional, just that he occupied the position of an officer of the United States. This argument not only misreads the plain language of section 2104, it would unacceptably broaden the President's authority under the Vacancies Act. In effect, the government's argument would mean that the President could unconstitutionally "appoint" an "officer," have him resign, and then use the Vacancies Act to fill the post for up to 120 days. The court cannot allow the government to use the fact that the initial Director was unconstitutionally appointed to bootstrap its way into a Vacancies Act designation, for this violates both the terms and the spirit of the Vacancies Act. Instead of accepting the interpretation urged by the government, the court interprets section 2104 as meaning that to become an officer, one must satisfy the basic legal requirement for taking office: *i.e.,* to take office, one is *required to be appointed.*

▮ In a similar vein, the government argues that whether or not Mr. Wall ever became a *de jure* officer, he was a *de facto* officer and thus an "officer" who "resigned." FDIC's PI Opposition at 19–20, 25. The court rejects this argument as well. The *de facto* officer doctrine works to protect the public interest by validating prior *acts* of persons performing the duties of an office under color of title. *See Andrade,* 729 F.2d at 1496 and cases cited therein. However, despite its name, it does not transform the nonofficer into an officer. Moreover, allowing the President to invoke the Vacancies Act whenever a *de facto* officer resigns would potentially allow the same kind of bootstrapping discussed above.[11] For these reasons, the

---

**11.** As plaintiff points out, a useful analytical device is to strike the unconstitutional provision

court refuses to hold that the *de facto* officer doctrine transformed Mr. Wall into an officer and made the Vacancies Act available upon his resignation.[12]

The government next argues that even if the term "officer" as used in section 3347 means constitutional officer, the statute should be interpreted as giving the President authority to fill vacancies, however created. The court is not free to do this. The statute clearly states that it applies "[w]hen an officer ... dies, resigns, or is sick or absent." Although defendants' argument is certainly logical, it is up to Congress—not this court—to decide the conditions under which the President may designate temporary replacements. Had Congress wanted to give the President general power to fill vacancies, it could have done so by wording the statute differently. The strict time limits placed upon life of a Vacancies Act designation clearly threaten that, in some instances, there will be no way under the Vacancies Act to appoint an interim official. However, a court would not be free to ignore these limits in order to avoid finding that an agency had no chief officer. Similarly, this court can not ignore the statute's clear provision detailing when the President may exercise Vacancies Act powers in order to avoid finding that OTS has no Director. Congress has been on notice for more than 100 years that the Vacancies Act has generally been interpreted as giving the President authority to designate officers *only* when the statute's express terms are satisfied. For example, a 1909 Attorney General opinion concluded that the President could *not* make a Vacancies Act appointment where the vacancy was caused by the retirement of a bureau chief. 27 Opp. Atty. Gen 337, 345 (1909). The Attorney General observed that "no provision is made in any of [the Vacancies Act] sections for temporarily filling a vacancy caused by the retirement of the chief of a bureau." He concluded that "if the vacancy be caused by the retirement of the incumbent, Congress having made no provision for the temporary discharge of his duties, the Bureau remains without a

from FIRREA and then see if the Vacancies Act would be available to the President. It would not: the Vacancies Act by its terms is not available to fill initial vacancies. 5 U.S.C. § 3345 *et seq.; Department of Energy—Appointment of Interim Officers,* 2 Op. O.L.C. 405, 407 (1978); *Matter of Department of Energy—Acting Officials' Status and Authority,* Op. No. B–150136 (May 16, 1978) (unpublished opinion of Comptroller General). The fact that an unconstitutional provision was included in FIRREA, and that Mr. Wall took office pursuant to that provision, should not render the subsequent acts *more* constitutional than they would have been absent the initial unconstitutional provision.

**12.** The government offers two related arguments in its attempt to validate Mr. Martoche's appointment, which warrant only brief treatment. First, the government argues that because Mr. Wall was the *de facto* Director, the *de facto* officer doctrine validates his act of resigning and transforms his resignation into the resignation of an officer. The fallacy of the government's claim is illustrated by applying it to a different set of facts. Under the government's reasoning, it would appear that one could not challenge *any* unconstitutional appointment because the officer's act of taking office would validate his status as an officer: by taking office and calling himself an officer, the person would become an officer. This is obviously wrong. The *de facto* officer doctrine validates *acts* upon which the public reasonably has relied. It does not change the fundamental nature of the act or transform the actor into something he is not.

Second, the government alleges that plaintiff cannot challenge the *de facto* acts of Mr. Wall and Mr. Martoche because it has failed to satisfy the two requirements announced in *Andrade.* OTS' TRO Opposition, at 27–29. The court rejects this claim for two reasons. First, Olympic is not asking this court to invalidate any of either Director's past acts, and therefore the *de facto* officer doctrine does not bar plaintiff's request. Second, plaintiff does meet *Andrade's* two requirements: it brought its lawsuit before the Acting Director appointed a receiver or conservator, and it notified OTS of its constitutional challenge before filing its lawsuit and in time for OTS to voluntarily refrain from acting against plaintiff. *See Andrade,* 729 F.2d at 1499; *see also Andrade v. Regnery,* 824 F.2d 1253, 1256 (D.C.Cir.1987) (filing of underlying lawsuit provides adequate notice of Appointments Clause challenge). The fact that Olympic participated in proceedings before OTS in the fall of 1989 *without challenging* Mr. Wall's appointment, FDIC's PI Opposition at 23, does not matter; until OTS threatened plaintiff with immediate, irreparable harm, Olympic did not have standing to bring its challenge. (Indeed, defendants' contend that even now Olympic does not have standing. The government's simultaneous assertion that Olympic's challenge is both too early and too late is rejected.)

head until the place if filled [by the President by and with the advice and consent of the Senate]." *Id.* at 345, 346.[13] *But see* 19 Opp. Atty. Gen. 500 (1890) (Vacancies Act permits temporary appointment to replace retired officer even though its terms technically only reach death, resignation, absence, and sickness). The same year, the Attorney General considered the Vacancies Act's provision allowing the President to designate "any other officer in either department" and concluded that only an officer actually holding an office in a department may be designated under the Act. 28 Op.Atty.Gen. 95, 97 (1909). He stated that "[i]t is not sufficient that [the designated person] has been appointed an officer by the President, by and with the advice and consent of the Senate; he must hold an office in a department which is established by law." *Id.* Almost twenty years earlier, the Attorney General had considered the provision allowing "the assistant or deputy" of a chief or other officer to act in the chief or officer's stead when they were absent. 19 Op. Atty. Gen. 503, 504 (1890). The Attorney General decided that "the expression 'the assistant or deputy of such chief or of such officer,' can only refer to assistants or deputies whose appointment is specifically provided for by statute." *Id.* at 504. As a result, he concluded that an officer of the Navy, detailed and assigned by the Secretary of the Navy as an assistant to the chief of a bureau, could not act in the chief's place under the Vacancies Act because there was no specific provision for the assignment of assistants to chiefs of bureaus from commissioned officers of the Navy. *Id.* at 503, 504. More recently, the Comptroller General considered the Vacancies Act and concluded that "by its terms, [the Act] clearly contemplates the vacating of an office by the person occupying the position as a condition precedent for the application of its provisions. Since none of the five offices [at issue] were previously occupied, it would appear that the Vacancies Act would have no application." *Matter of Department of Energy—Acting Officials' Status and Authority,* Op. No. B–150136 (May 16, 1978) (unpublished opinion). Two days later, the Attorney General agreed with this conclusion. *Department of Energy—Appointment of Interim Officers,* 2 Op. O.L.C. 405, 407 (1978) ("[t]he existing procedures provided for in the Vacancies Act ... were not adapted to initial vacancies in a newly established department"); 411 ("[w]e have read the opinion of the Acting Comptroller General dated May 16, 1978.... We agree with it to the extent that it concludes that the Vacancies Act is inapplicable to the situation at hand"). Moreover, the Attorney General concluded that the Vacancies Act did not permit the President to designate as initial Department of Energy officers ex-officers of DOE's predecessor agency because, when the predecessor agency was abolished, those persons ceased to be officers. *Id.* at 407. Thus, the Attorney General expressly rejected a broad, ends-oriented reading of section 3347 which would have permitted the President to designate the most qualified persons, who had previously been nominated by the President and confirmed by the Senate for virtually identical positions, as interim DOE officials. *Id.*

The above opinions are of course not binding precedent. However, they are useful for two purposes. First, these opinions show that the Attorney General and other senior government officials have, for the last 100 years, interpreted the Vacancies Act as giving the President authority to make interim appointments *only* when the express conditions of the Act are satisfied. As defendants point out, the Attorney General is charged with responsibility for ensuring that only lawfully appointed officials act on behalf of the United States, and consequently his interpretation of law on

---

**13.** In the case under consideration by the Attorney General, the President retired the officer after concluding that he was no longer fit to perform his duties. The Attorney General distinguished this from the case where an incumbent resigns, finding that the latter "implies the consent of the incumbent to the giving up of the office and does not include the compulsory retirement of an officer by reason of disability to perform the duties of the office." 27 Op. Atty. Gen. at 345. This distinction is at least as fine as the one urged by plaintiff, *i.e.,* that if Mr. Wall was never constitutionally appointed he was not an "officer" under the Vacancy Act.

**1198**

this subject is entitled to great deference. OTS' PI Opposition at 15 n. 9. Second, these opinions show that Congress has been on notice for more than a century that the Vacancies Act is generally strictly and narrowly interpreted. If Congress intended the Act to serve a more general purpose—to allow the President to fill any vacancy, however created—as the government contends, Congress has had ample opportunity to amend the statute to give effect to that intent.

The government argues that FIRREA itself represents Congressional support for a broad interpretation of the Vacancies Act. According to the government, "the obviously disastrous effects [a narrow reading] would have on Congress' legislative efforts to salvage the thrift industry itself suggests the unlikelihood that Congress could have intended plaintiff's interpretation of the Vacancy Act." FDIC's PI Opposition at 9; *see also id.* at 11. However, the Vacancies Act was enacted long before FIRREA and thus Congress' goals in enacting FIRREA are irrelevant in interpreting the Vacancies Act.

Not only does FIRREA *not* support the government's broad interpretation of the Vacancies Act, it argues against that interpretation. FIRREA specifically provides that "[a] vacancy in the position of Director which occurs before the expiration of the term for which a Director was appointed shall be filled in the manner established in

paragraph (1) [appointment by President, by and with advice and consent of Senate], and the Director appointed to fill such vacancy shall be appointed only for the remainder of such term." FIRREA § 301, 103 Stat. 278. The court cannot accept the government's claim that this provision "is boilerplate language of the kind that exists in countless statutes" and that it was included "merely to provide a method by which a *permanent* replacement for the Director may be appointed when the incumbent leaves before the end of his term." FDIC's PI Opposition at 10 n. 8 (emphasis in original). If this were true, the portion of the provision requiring Senate confirmation would have no effect: the Vacancies Act allows only for temporary designations, and FIRREA mandates that the Director must be appointed with the advice and consent of the Senate. Thus, even without FIRREA's vacancy provision, permanent replacements would have to be appointed with the advice and consent of the Senate. If the vacancy provision means only that *permanent* replacements must be appointed with the Senate's consent, as the government contends, then it means nothing.[14] The court will not interpret the vacancy clause in a way which renders all or a portion of it meaningless. *See* OTS' PI Opposition at 13 n. 7 (both FIRREA and Vacancies Act should be interpreted such that neither is rendered superfluous) (citing *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981)).[15] As a

14. The other half of the vacancy clause, which provides that a replacement Director shall serve only the remainder of the prior Director's term, would have meaning even under the government's interpretation.

15. The government argues that to apply the FIRREA provision in this circumstance "would suggest that Congress wanted vacancies in the office to continue until confirmation of a successor, even though Congress was so concerned about a temporary period without a Director that it designated the specific person who would be the first Director of OTS, and provided that he would immediately assume the office of Director." The legislative history nowhere states that the Wall provision was included to avoid a temporary initial vacancy. Indeed, various portions imply that this was not the reason FIRREA specified that Wall would the OTS' first Director. *See, e.g.,* H.R.Rep. 54, part 1, 101st

Cong., 1st Sess. 425 (1989) (House Committee on Banking, Finance, and Urban Affairs would have deleted provision making Wall OTS' initial Director due to Wall's failure to effectively execute his responsibilities and to assist Congress in its effort to examine S & L crisis, and would have prohibited any FHLBB member from becoming Director without formal nomination and confirmation); 135 Cong.Rec. S4240-47 (debate responding to proposal to remove provision appointing Wall as OTS' initial Director focused exclusively on Wall's qualifications and fairness of "removing" him mid-term, but did not mention need to avoid temporary vacancy). Moreover, FIRREA's history is replete with references to the abuses which existed under the FHLBB and with expressions that Congress must take a more responsible and active role in overseeing the thrift industry. *See, e.g.,* S.Rep. No. 19, 101st Cong., 1st Sess. 3–5 (1989) (Senate Committee on Banking, Housing, and Urban

result, the court finds that the vacancy clause is evidence that FIRREA did not envision, and that in enacting FIRREA Congress did not desire, a broad, results-oriented interpretation of the Vacancies Act.[16]

For all of the foregoing reasons, the court concludes that the Vacancies Act should be interpreted as authorizing the President to designate an acting officer *only* when a prior, constitutionally appointed officer dies, resigns, or is sick or absent. As a result, in light of the court's conclusion that Mr. Wall never constitutionally became the Director of OTS, *see* p. 1193, *supra*, the court finds that Mr. Martoche's appointment was not authorized by the Vacancies Act.

ii. *Did the President have Inherent Authority to Appoint Mr. Martoche Under the Facts Present in this Case?*

The FDIC argues that, even if the Vacancies Act did not confer on the President the authority to designate Mr. Martoche, the President has inherent authority to appoint officers and that he properly exercised that authority in this case. FDIC's PI Opposition at 25–29. To accept this argument, the court would need to ignore a prior decision of this Circuit's Court of Appeals as well as the more than 100 years unchallenged use of the Vacancies Act.[17]

In *Williams v. Phillips*, 482 F.2d 669, 670 (D.C.Cir.1973), the Court of Appeals for the District of Columbia Circuit refused to stay the District Court's order enjoining the Acting Director of the Office of Economic Opportunity from taking any further action as Acting Director of OEO pending appeal of that order. The District Court had concluded that "in the absence of ... legislation vesting a temporary power of appointment in the President, the constitutional process of nomination and confirmation must be followed." *Williams v. Phillips*, 360 F.Supp. 1363, 1371 (D.D.C.1973). The District Court had squarely rejected the argument, now made in this case by the FDIC, that the President has authority to make temporary appointments pursuant to his Article II, § 3 obligation to "take Care that the Laws be faithfully executed." *Id.* at 1368–69. While the Court of Appeals did not unequivocally affirm the District Court, it did state that the President's inherent power to appoint, if it exists at all, is limited. *Williams*, 482 F.2d at 670–71.

The following circumstances, taken together, cause this court to conclude that the appointment of Mr. Martoche was not a proper exercise of whatever limited power the President may possess. First, the government has not argued that any emergency existed beyond the general emergency which exists whenever a regulatory body charged with important functions is left without its primary officer. If this were enough to create an emergency and justify appointments outside the Vacancies Act and the Constitution, the protections afforded by the Act and the Constitution would quickly be lost. Second, if any emergency did exist it was the result not of

---

Affairs discussed prior abuses and stressed need for diligent committee oversight of thrift industry). These statements support the conclusion that Congress was more concerned with temporary losses of its oversight power than with temporary vacancies, and that it included the vacancy clause to ensure that no person would act as Director who had not been subjected to Senate scrutiny.

16. The court need not conclusively determine exactly what FIRREA's vacancy provision means and whether it preempts the Vacancies Act with respect to the position of Director of OTS. The court has concluded that the Vacancies Act cannot be used to justify Mr. Martoche's appointment, and therefore there is no conflict in this case. The discussion of FIRREA's vacan-

cy clause is intended solely to further illuminate why the court believes that it would be inconsistent with the Vacancies Act and not in furtherance of FIRREA's goals for the court to interpret the Vacancies Act in the manner requested by the government.

17. Olympic argues persuasively that the Constitution itself makes clear that the President does not have any inherent power to appoint officers without the advice and consent of the Senate. Plaintiff's Post–Argument Memorandum in Support of Motion for a Preliminary Injunction at 13–15 (filed Mar. 15, 1990). The court need not decide whether this is true because the circumstances of this case make it clear that, if such power exists at all, it was not available to the President under the facts present herein.

unforeseen circumstances, but of FIR-REA's unconstitutional attempt to appoint Mr. Wall as OTS's initial Director. The Constitution surely is not served if its avoidance creates in the President powers which he otherwise would not have. Third, unlike the situation present in *Williams*, the Vacancies Act does generally apply to vacancies in OTS. Where Congress has delegated to the President limited power to fill the kind of vacancy at issue, and where that power was not sufficient to permit the attempted designation, the Court should not broaden Congress' delegation by invoking an undefined and generally unrecognized Presidential power. For these reasons, the court believes it would be improper under *Williams* to find that the President's designation of Mr. Martoche was a permissible exercise of his inherent authority.

Moreover, if the court were to find that the President had the inherent authority to designate Mr. Martoche Acting Director of OTS, then the Vacancies Act would be an unconstitutional limitation on the President's constitutional powers. *See Williams*, 360 F.Supp. at 1369. The court is not inclined to hold that the Vacancies Act, relied on by all branches of the government for more than 100 years, *see* Plaintiff's Post–Argument Memorandum in Support of Motion for a Preliminary Injunction at 16–19 (filed Mar. 15, 1990) ("Plaintiff's Post–Argument Memorandum"), is and always has been unconstitutional.

For the foregoing reasons, the court finds that if the President has any inherent authority to appoint temporary officers, his authority is limited and the circumstances which would permit its use were not present in this case. The court therefore concludes that Mr. Martoche was not validly appointed.

c. May Other OTS Officials Exercise the Director's Power to Appoint a Receiver or Conservator Pursuant to Previous Delegations of Authority?

 Defendants finally argue that, even if Mr. Martoche cannot exercise the powers of the Director, both Mr. Wall and Mr. Martoche delegated their authority to other officers within OTS. According to OTS, these delegations are past acts which should be recognized under the *de facto* officer doctrine and therefore the delegatees can now exercise all the powers of the Director.

Assuming these delegations were otherwise proper, each of the Directors could not delegate more authority than he himself had. In light of the court's conclusion that neither Mr. Wall nor Mr. Martoche were ever constitutionally appointed Director of OTS and therefore never exercised their powers excepts as *de facto* officers, at most they were able to delegate *de facto* authority. As a result, none of their subordinates' future acts are protected from judicial scrutiny under the *de facto* officer doctrine. The fact that the delegations are past acts does not bring the delegatees' future acts within the doctrine's protection. Accordingly, because Mr. Martoche cannot constitutionally appoint a receiver or conservator for Olympic, neither can any of his subordinates.

For the foregoing reasons, the court concludes that Olympic has a strong probability of success on its claim that neither Mr. Wall nor Mr. Martoche were constitutionally appointed Director of OTS and that therefore neither they nor any of their subordinates may constitutionally appoint a receiver or conservator for Olympic.

2. *Plaintiff's Irreparable Injury.*

Despite defendants' arguments, plaintiff will clearly suffer an irreparable injury if its request for injunctive relief is not granted. If a receiver or conservator is appointed, there is a reasonable probability that Olympic will be destroyed or fundamentally altered. *See* Plaintiff's Post–Argument Memorandum at 25–31.[18] OTS contends that it will get fair market value for any

---

18. The government argues that a receiver or conservator, if appointed, would not necessarily liquidate Olympic. FDIC's PI Opposition at 46–47. However, in light of OTS' refusal to promise not to liquidate Olympic, this assertion does not render Olympic's injury arguments untenable.

assets sold and that therefore Olympic will not be harmed by liquidation. OTS' PI Opposition at 25–26. However, this argument ignores two important considerations. First, receiving the fair market value for a business' assets is not necessarily adequate; the destruction of the business is itself an irreparable injury. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952) (seizure and government operation of ongoing business were bound to result in damages of such a nature as to be difficult, if not incapable, of measurement); *WMATA v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977) (destruction of a business is an irreparable injury).[19] Olympic's owners have not chosen to liquidate the thrift, and the government has no right to impose this choice upon it. The fact that Olympic may soon fail even without government intervention does not transform its immediate destruction at OTS' hands into an insignificant intrusion. As the Court of Appeals has made clear, one is injured when the government improperly takes away a right, whether or not the end result is inevitable. *See Andrade,* 729 F.2d at 1494–96. Second, if OTS agrees not to assert the *de facto* officer doctrine in a post-appointment challenge, it is highly unlikely that the receiver or conservator could get fair market value for Olympic's assets. Any possibility that this court would order OTS to undo the transactions entered into by the receiver or conservator would increase the level of uncertainty associated with any sale and ensure that any buyer would discount the price he would otherwise pay for Olympic's assets.

If OTS and FDIC will not or can not waive the right to assert the *de facto* offi-

cer doctrine in a post-appointment proceeding, Olympic's injury would be compounded because it would permanently lose its right to challenge Mr. Martoche's authority to act as OTS' Director. If a receiver or conservator is appointed and that appointment is then validated under the *de facto* officer doctrine, Olympic's constitutional claim would be moot and Olympic would forever be barred from challenging the manner in which the government took away its business. *Andrade,* 729 F.2d at 1497.[20] This additional injury—the permanent loss of the right to challenge the constitutionality of Mr. Martoche's appointment and authority to regulate Olympic—renders FIRREA's judicial review provision inadequate.

3. *The Harm to Defendants and to Others.*

Defendants do not assert that they will be directly harmed should the court issue the injunction requested by plaintiff. Rather, defendants' harm flows solely from their inability to protect the public interest should the Director be enjoined from taking certain actions. Similarly, the harm to others is solely a harm to the public and, specifically, to the taxpayers. As a result, the portion of the court's analysis focusing on harm to defendants and to others is treated in the next section.

4. *The Public Interest.*

The government claims that Olympic's "precarious financial condition and the risk of enormous loss to the federal insurance fund" make clear that an injunction would not serve the public interest. OTS' Preliminary Injunction Opposition, at 26. They have argued that, should the court issue the injunction requested by plaintiff, the

---

**19.** Contrary to the government's argument at the hearing on plaintiff's motion for a PI, the Supreme Court's finding of irreparable injury in *Youngstown* did not solely depend on the uncertainty that plaintiff would be entitled to recover the value of property taken for a public use. *See* 343 U.S. at 585, 72 S.Ct. at 865.

**20.** The court is not convinced that OTS and FDIC can promise not to raise the *de facto* officer doctrine in subsequent proceedings. The doctrine is designed "to protect *the public*

by ensuring the orderly functioning of the government despite technical defects in title to offices." OTS' TRO Opposition, at 26 (citing *State Dental Council and Examining Board v. Pollock,* 457 Pa. 264, 318 A.2d 910, 913 (1974)) (emphasis added). If innocent parties enter into transactions with Olympic's conservator or receiver, it might be improper to ignore their plight and attempt to undo what the conservator or receiver had done under color of law.

court will subject S & L depositors, the thrift industry, and the nation's entire financial system to extraordinary and unreasonable risks. FDIC's TRO Opposition at 34.

Olympic has not asked this court to issue a sweeping injunction prohibiting the Director from taking any action against any S & L. Rather, it has requested that the court enjoin the Director from appointing a receiver or conservator for Olympic until it decides the merits of this action. The court does not believe that Olympic, if given the relief it requests, poses a serious threat to the public interest and the Savings Association Insurance Fund. Certainly there is some danger associated with allowing any at-risk thrift to continue operating. However, a number of facts minimize the risk presented by Olympic. First, OTS has *never* alleged that Olympic's officers are engaging or have engaged in any affirmative misconduct. Rather, OTS attributes Olympic's poor operating results to a high level of non-earning assets and nominal interest margins. OTS' TRO Opposition at 7. Second, although Olympic has failed to make its operations profitable, it has managed to remain marginally profitable by engaging in certain nonrecurring actions. OTS' TRO Opposition at 7. Third, Olympic's troubles do not appear to be anything new. Although its performance may be deteriorating, OTS' TRO Opposition at 7, both Olympic and the thrifts it acquired between 1982 and 1984 were in poor financial health at the time of the acquisitions. *See* OTS' TRO Opposition at 7 (although FHLBB approved the mergers proposed by Olympic, it recognized that Olympic's prospects for a return to viability were tenuous). Fourth, Olympic is currently operating—and notwithstanding the PI will remain operating—subject to a number of restrictions on its business operations. *See* OTS' TRO Opposition at 39 and Exhibit D. These restrictions, previously imposed by OTS,

should help to prevent plaintiff (and consequently the SAIF) from suffering any sudden catastrophic losses. Finally, it appears that OTS itself has decided that Olympic does not pose such a serious, immediate threat that it should be subjected to OTS' full range of supervisory powers. On February 12, 1990, the District Director of OTS permitted Olympic to make several categories of loans without individual OTS approval, notwithstanding OTS' normal policy of requiring approval of each new loan. OTS' TRO Opposition at 8.[21]

The court stresses that it is neither closing the door on OTS nor making any finding beyond the specific facts of this case. The court's conclusion that Olympic is entitled to the injunctive relief it requests depends not only on the conclusion that plaintiff has shown a strong likelihood of success on the merits and an irreparable injury. The injunction depends, in the end, on a finding that these factors outweigh the public interest in protecting the Savings Association Insurance Fund against future losses. If conditions at Olympic should change—if, for example, there were a run on the thrift or if OTS discovered that Olympic's managers were looting the thrift's assets—OTS could come to the court, present those facts, and seek to dissolve the preliminary injunction. Contrary to OTS' assertions, OTS' TRO Opposition at 38–39, 42, Olympic has not requested, and this court is not issuing, an order invalidating Mr. Wall and Mr. Martoche's past acts or enjoining OTS from exercising any of its supervisory and regulatory powers *other than* its power to appoint a receiver or conservator *for Olympic* until a new Director is properly appointed. Although this may lead to a great deal of litigation and place OTS' operations in some confusion, the clear violation of plaintiff's constitutional rights and the public's interest in

---

**21.** The court also notes that, at the hearing on plaintiff's motion for a temporary restraining order, it responded to OTS' ripeness argument by asking whether OTS would agree to provide the plaintiff and the court with six hours' notice before appointing a receiver or conservator. OTS refused, effectively forcing this court to address the merits of plaintiff's claim. Having refused to exercise its discretion and thereby having forced an immediate challenge, OTS is in a weak position when it now asks the court to exercise the court's discretion and ignore plaintiff's clear right to a preliminary injunction.

protecting the Constitution outweigh these harms to the public interest.

### III. *Conclusion.*

For all of the foregoing reasons, and pursuant to the order issued this date, Olympic's motion for a preliminary injunction is GRANTED. The government's only specific request for bond was in the amount of Olympic's total deposits—approximately $835 million. OTS' PI Opposition at 26–27. This is clearly excessive. Bond is therefore set at $1,000.