903 F.2d 1471
 134 L.R.R.M. (BNA) 2635, 115 Lab.Cas. P 10,133
 Jack FRECH, Grady E. Robinson, and Caesar Smith,
Plaintiffs-Appellees, Cross-Appellants,
v.
PENSACOLA STEAMSHIP ASSOCIATION, Defendant,
International Longshoremen's Association Local 1988,
Defendant-Appellant, Cross-Appellee.
 No. 89-3459.
 United States Court of Appeals,
Eleventh Circuit.
 June 25, 1990.
 
 Arthur A. Shimek, Arthur A. Shimek, P.A., Pensacola, Fla., for defendant-appellant, cross-appellee.
 George W. Estee, Pensacola, Fla., W.A. Kimbrough, Jr., Frank Woodson, Turner, Onderdonk & Kimbrough, P.A., Mobile, Ala., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Northern District of Florida.
 Before CLARK and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 This is an appeal by International Longshoremen's Association (ILA) Local 1988 from a judgment by the trial court finding it liable for damages for failure of fair representation of three union members in a labor dispute between the plaintiffs and the union and between the plaintiffs and Pensacola Steamship Association, Inc. (PSA) for whom the plaintiffs worked in checking the loading and unloading of ships at the Port of Pensacola, Florida. Plaintiffs cross-appealed from the denial of the trial court of their claim for attorney's fees.
 
 I. BACKGROUND
 
 2
 The plaintiffs are "checkers", dock workers who inspect cargo as it goes off or on a ship and make an accounting of the cargo. Historically, the checkers have not been members of any local union. They were paid at a higher rate than union longshoremen. The Pensacola Steamship Association is a membership corporation for stevedoring companies in Pensacola. They bargain in a multi-employer unit with the ILA over three year working agreements. In 1975, during negotiations over a pending collective bargaining agreement, the PSA and Local 1988 entered into an agreement, resolving a long stalemate in bargain negotiations, providing that the checker positions which were not then within the aegis of the union, would come under ILA control. On July 7, 1975, the PSA, Local 1988, and the union signed an "addendum" to the proposed working agreement which was to be effective until 1978.
 
 
 3
 This "addendum" provided in relevant part as follows:
 
 
 4
 We the officers and members of Local 1988 hereby agree when the present men that is [sic] now performing the clerk and checkers work for members of the Pensacola Steamship Association become members of ILA Local 1988, the present men will continue to perform the work of clerk, checking, receiving and delivering of cargo to and from the warehouse, as heretofore.
 
 
 5
 We further agree that the above men will be hired as heretofore, as long as these men remain members in good standing with the ILA Local 1988....
 
 
 6
 This addendum will be effective on the date signed.
 
 
 7
 The addendum was signed on July 7, 1975, and the collective bargaining agreement for the three year period was signed on July 9, 1975. The effect of this agreement was to "grandfather" the then checkers into Local 1988 as a separate seniority unit. As "senior checkers" they had super seniority with respect to hiring for checker assignments. This continued as to each of the then checkers as long as he remained a member of the Local. If additional checkers were needed, beyond these particular men, the jobs would be filled by other members of the Local according to the Local's seniority rules. The provisions of this addendum were continued in the subsequent working agreement until the fall of 1983 when bargaining sessions failed to produce a new contract to replace the 1980-1983 working agreement which would expire September 1983. On September 29, 1983, the union and PSA entered into an agreement to extend the term of the 1983 contract through January 15, 1984.
 
 
 8
 In January 1984, Local 1988 elected a new group of officers who replaced persons serving on the negotiating committee. This committee sought to have PSA agree to the abolition of the checkers' separate seniority. The PSA declined, stating that the 1975 "checker agreement" was binding on both the PSA and Local 1988 and that the provisions of that agreement could not be modified in a collective bargaining agreement. On February 11, 1985, the president of the union posted a notice in Local 1988's union hall stating that checkers would not be hired as before, but rather they would be hired in the same manner and in the same seniority unit as longshoremen.
 
 
 9
 Thus, the union elected unilaterally to abolish the preferred hiring status of senior checkers.
 
 
 10
 Because of the lack of agreement between Local 1988 and PSA on this issue, they submitted it to arbitration, which was held without notice to the senior checkers. The arbitrator decided in favor of Local 1988. Thereupon, the three senior checkers still covered by the 1975 agreement protested, and the matter was subsequently presented to the same arbitrator with the checkers being allowed to have separate counsel to present their views to the arbitrator. Once again, the arbitrator decided in favor of the Local.
 
 
 11
 The plaintiffs then filed this lawsuit on November 22, 1985, based on Sections 9(a) and 301 of the Labor Management Relations Act of 1947, 29 U.S.C. Secs. 159(a) and 185. The complaint sought a permanent injunction and damages. The trial court first tried the issue of liability and, having found defendants liable, determined that any damages to be assessed should be paid by the Local union, because PSA was not at fault. The court then held extended hearings on the amount of damages and entered a final judgment against the union and in favor of the three plaintiffs individually. The court also entered a permanent injunction against both defendants.
 
 II. FACTS
 
 12
 In addition to the facts previously stated, the court found that the 1975 agreement was a contract separate from the working agreement, executed two days later. The court found that there were approximately 12 individuals who were checkers at the time the 1975 agreement was signed and that there were only three remaining at the time the union attempted to change the seniority status of the checkers. The court also found that the plaintiffs were third-party beneficiaries of the 1975 agreement.
 
 
 13
 The court also specifically found the essential facts necessary to determine the increments to be considered and the amount due in damages to each of the plaintiffs.
 
 III. DISCUSSION
 A. Liability
 
 14
 The principal argument of appellants on the issue of liability is based on their contention that the 1975 addendum was a part of the working agreement entered into for that year and that "therefore, it was not binding on the union after September 30, 1977." Even though it was continued until the contract negotiations in 1984, the union contends that this was done voluntarily by the union and not because of any binding effect of the 1975 agreement.
 
 
 15
 First of all, we note that the 1975 agreement, although called an "addendum" to the working agreement, was signed separately on July 7, whereas the working agreement itself was signed on July 9, 1975. During the negotiations in 1984 between Local 1988 and PSA, PSA agreed with the plaintiffs that the 1975 checker agreement established rights in the plaintiffs as third-party beneficiaries of an independent contract between the PSA, Local 1988 and the ILA. Thus, the district court stated:
 
 
 16
 Under this theory, the plaintiffs' preferred status as senior checkers within Local 1988 is a right which no collective bargaining agreement can modify or abrogate. Rather than being a creature of a collective bargaining agreement, the plaintiffs and PSA claim the 1975 checker agreement has independent validity.
 
 
 17
 Appellants argue that even if the checker agreement was an independent contract, the court had no jurisdiction under Section 301. The trial court properly answered this contention by citing Retail Clerks International Association, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962). Before the Court in Lion Dry Goods was an alleged breach of a settlement agreement made between a local union and the employer, Lyon Dry Goods Company. The action was brought under Section 301. The Court stated:We need not decide whether or not this strike settlement agreement is a "collective bargaining agreement" to hold, as we do, that it is a "contract" for purposes of Sec. 301(a). "Contract in labor law is a term the implications of which must be determined from the connection in which it appears." J.I. Case Co. v. Labor Board, 321 U.S. 332, 334 [64 S.Ct. 576, 579, 88 L.Ed. 762]. It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship. Plainly it falls within Sec. 301(a). "[F]ederal courts should enforce these agreements on behalf of or against labor organizations and ... industrial peace can be best obtained only in that way." Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455 [77 S.Ct. 912, 917, 1 L.Ed.2d 972].
 
 
 18
 369 U.S. at 28, 82 S.Ct. at 548.
 
 
 19
 As the trial court here pointed out, this agreement precipitated the conclusion of collective bargaining agreement negotiations which had been continuing for over nine months between the PSA and Local 1988. After referring to the above-quoted language from Lion Dry Goods, the court stated:
 
 
 20
 Here, the 1975 checker agreement had a comparable effect in that it was the catalyst for the settlement of the protracted labor dispute during which the union had resorted to economic weapons. It was clearly "an agreement between employers and labor organizations significant to the maintenance of labor peace between them," rather than simply a provision to be incorporated into the proposed collective bargaining agreement.
 
 
 21
 Soon after the Supreme Court decision in Lion Dry Goods, the Court of Appeals for the Fifth Circuit stated in Deaton Truck Line, Inc. v. Local Union 612, etc., 314 F.2d 418 (5th Cir.1962):
 
 
 22
 The main issue urged by Deaton on this appeal is that the district court had no jurisdiction under Sec. 301 of the Taft-Hartley Act, 29 U.S.C.A. Sec. 185 ... over the mileage tax--license tag dispute because it was not a labor grievance but a commercial dispute between independent contractor-lessors and their lessee. Deaton's contention is predicated upon too narrow a meaning of "contracts" as used in Section 301(a). It is now settled that "contracts", as there used, includes more than "collective bargaining agreements," and is broad enough to include any agreement "between employers and labor organizations significant to the maintenance of labor peace between them."
 
 314 F.2d at 422.[1]
 
 23
 We are thus satisfied that the trial court correctly held that it had jurisdiction under Sec. 301(a).
 
 
 24
 The trial court also held that "[e]ven if the 1975 agreement is not a Section 301 contract that is independently enforceable, the plaintiffs are also entitled to recover for breach of the 1975 checker agreement on the theory of promissory estoppel." The court cited Hass v. Darigold Dairy Products Co., 751 F.2d 1096 (9th Cir.1985), Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1217-19 (6th Cir.), cert. denied, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987), and Acri v. International Association of Machinists & Aerospace Workers, 781 F.2d 1393, 1397-98 (9th Cir.), cert. denied, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986).
 
 
 25
 The principle of promissory estoppel is set out in the ALI Restatement (Second) of Contracts, Sec. 90(1) (1979). This Restatement provides:A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
 
 
 26
 The facts found by the trial court as to the promise by the union which could reasonably be expected to induce the action of the plaintiffs were: (a) "In 1979, the checkers sought to establish a separate local affiliate with the ILA. They dropped that effort after receiving assurances from the International and Local 1988 that their hiring status was secure" and (b) "In 1981 the checkers again filed a petition with the international for a separate local. That petition was withdrawn after a meeting with an international representative ... and local 1988. The checkers were again assured that their hiring rights would not be changed." Comparing the facts here with those in the Hass case the trial court stated:
 
 
 27
 [T]he plaintiffs here held a favorable seniority position which they had the option to extend indefinitely by not transferring to a different status; that is, they did not have to join the union in 1975. However, they were persuaded to transfer to the union after receiving assurances that their seniority status as checkers would be preserved just as it would have been had they not switched. Transferring to the super seniority unit within the union was an entirely reasonable and foreseeable decision on the part of the plaintiffs based on the assurances of Local 1988 and PSA. The 1975 checker agreement was "a specific and unqualified response" to the plaintiffs' "clearly expressed concerns over the particular changes of employment status which [they were] contemplating openly." Hass, 751 F.2d at 1100.
 
 
 28
 Permitting the union to use a collective bargaining agreement to take away the plaintiffs' seniority status would simply be unjust. The defendants are therefore estopped from enforcing any provision in a collective bargaining agreement which is inconsistent with the 1975 checker agreement.
 
 B. Damages
 
 29
 The trial was bifurcated by the court, first to determine liability and thereafter to determine what, if any, damages were to be awarded to the plaintiffs. The trial court held several conferences with counsel on damages and outlined certain standards which it felt they should apply and requested them, if possible, to agree on the amounts to be arrived at under the court's guidelines. They were unable to agree, and the court then held a hearing and received evidence on the damages to be awarded. It made its decision awarding damages to each plaintiff. The total damages to the three plaintiffs was approximately $45,000 plus interest and costs.
 
 
 30
 Upon motion of the defendants, the court thereafter amended its findings and conclusions as to the amount of damages to be paid. It recomputed the amount and awarded a somewhat smaller amount of total damages to each of the three plaintiffs. The total amount of damages to the plaintiffs was approximately $40,000 plus interest and costs.
 
 
 31
 Appellants do not dispute the trial court's method of computing damages which, as stated in International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 48-49, 99 S.Ct. 2121, 2125-26, 60 L.Ed.2d 698 (1979), is "to compensate for injuries caused by violations of employees' rights." Nor do they contest the right of the district court to fashion an appropriate remedy, one that is tailored to fit the circumstances of the case. Vaca v. Sipes, 386 U.S. 171, 187-95, 87 S.Ct. 903, 915-19, 17 L.Ed.2d 842 (1967). This Court has held that relief provided should be "a just and reasonable approximation of the actual injury sustained." American Bridge Division v. International Union of Operating Engineers, Local 487, 772 F.2d 1547, 1552 (11th Cir.1985).
 
 
 32
 The careful analysis in this case by the trial court in determining to the best of its ability a just and reasonable approximation exceeds anything that has come to our attention in any previous case.
 
 
 33
 Appellants, however, complain specifically of the trial court's findings of the number of hours which plaintiffs would have worked during the three years, 1985, 1986 and 1987. Such a finding was necessary in order for the plaintiffs to qualify for the pension, welfare and vacation (PWV) plan. In order to qualify, they each would have had to work 700 hours per year. The trial court found that since all three plaintiffs had worked more than 700 hours per year for the nine years previous to the three years here involved, it should find that they worked a minimum of 700 hours per year during 1985, 1986 and 1987. However, the court had previously recognized as accurate and complete the joint exhibits 1 and 2 which showed without question that the 700 hours was not attainable in 1987 and was attainable only by plaintiff Smith in 1986. The court used these exhibits to find the amount due as back wages.
 
 
 34
 We find these two determinations by the court to be inconsistent and we conclude that the court is bound by the itemized figures agreed to by the parties in exhibits 1 and 2. Thus, the awards to Frech and Robinson representing contributions to the PWV plans for 1986 and for all three plaintiffs for 1987 must be deducted from the final award of damages.
 
 
 35
 Appellants also complain that the trial court declined to consider "outside income." They contend that such outside income would not have been earned if the checkers had been engaged in their checking activities. However, they give no record reference to any amount or the nature of the work performed to produce the outside income. On the other hand, the appellees contend that such outside income would have been earned even though they had been engaged in their regular duty as checkers. In the case of one plaintiff, it was earned from his acting as a minister in a church and in the case of another plaintiff, it was earned from a separate construction business operated by him. There is nothing in the record to show what is the truth in this situation. Thus, the trial court was not in error for not including such outside income as a mitigating factor.
 
 
 36
 We conclude, therefore, that except for the PWV amounts, the assessment of damages by the trial court was not clearly erroneous.
 
 IV. CROSS-APPEAL
 
 37
 Cross-appellants contend that although the Labor-Management Relations Act does not authorize the granting of attorneys' fees for violations under Section 301(a), a court can grant attorneys' fees under its equity power if a party violates Section 301(a) in bad faith, vexatiously, wantonly or for oppressive reasons, citing District 50 UMW v. Bowman Transportation, Inc., 421 F.2d 934 (5th Cir.1970). Cross-appellants contend that since the trial court found that the union's conduct was motivated solely by "political" reasons, and that the union's activities were "arbitrary, discriminatory and in bad faith" the court was required to grant attorneys' fees. We review such a decision on an abuse of discretion standard. International Association of Machinists v. Texas Steel Co., 639 F.2d 279, 283 (5th Cir.1981).
 
 
 38
 Recognizing the care with which the trial court fully analyzed the case in both its liability and damages orders, we conclude that there was no abuse of discretion here.
 
 
 39
 The judgment on liability is AFFIRMED. The judgment on damages is AFFIRMED except for the PWV amounts as outlined above. The case is therefore REMANDED to the trial court for the correction of the damages awards.
 
 
 
 [1]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981