51 F.3d 1016
 26 UCC Rep.Serv.2d 547
 Thelma V.A. GIBSON, Catherine H. Fahringer, F. Lee Bailey,
Richard E. Gerstein, Edward A. Carhart, Paul M. Rashkind,
Ronald C. Dresnick, Bonnie Rippingille, d/b/a Bailey,
Gerstein, Carhart, Rashkind, Dresnick & Rippingille, P.A.,
Plaintiffs-Counterdefendants, Crossclaim Defendants-Appellants,
David L. Paul, Intervenor-Appellant,
v.
RESOLUTION TRUST CORPORATION, as Receiver, A United States
Agent and Instrumentality,
Defendant-Counterplaintiff, Crossclaim
Plaintiff-Appellee,
Centrust Bank, a Florida State Savings Bank, Citibank, N.A.,
a National Association, Centrust Federal Savings
Bank, a Federal Savings Bank, Defendants.
Thelma V.A. GIBSON, Catherine H. Fahringer, F. Lee Bailey,
Richard E. Gerstein, Edward A. Carhart, Paul M. Rashkind,
Ronald C. Dresnick, Bonnie Rippingille, d/b/a Bailey,
Gerstein, Carhart, Rashkind, Dresnick & Rippingille, P.A.,
Plaintiffs-Counterdefendants, Crossclaim Defendants-Appellants,
David L. Paul, Intervenor,
v.
RESOLUTION TRUST CORPORATION, as Receiver, A United States
Agent and Instrumentality,
Defendant-Counterplaintiff, Crossclaim
Plaintiff-Appellee,
Centrust Bank, a Florida State Savings Bank, Citibank, N.A.,
a National Association, Centrust Federal Savings
Bank, a Federal Savings Bank, Defendants.
 Nos. 91-5035, 91-5408.
 United States Court of Appeals,
Eleventh Circuit.
 May 10, 1995.
 
 Candace J. Fabri, Sachnoff & Weaver, Ltd., Chicago, IL, for Resolution Trust in both cases.
 Jeanette E. Roach, F.D.I.C., Washington, DC, for Resolution Trust Corp. in No. 91-5035.
 Jose I. Astigarraga, Steel, Hector & Davis, Miami, FL, for Citibank, N.A.
 Alan G. Greer, Floyd, Pearson, Richman, Greer, Weil, Brumbaugh & Russomanno, P.A., Miami, FL, for Gibson.
 David L. Paul, Bal Habour, FL, pro se in both cases.
 Appeals from the United States District Court for the Southern District of Florida.
 Before CARNES, Circuit Judge, and DYER and GUY*, Senior Circuit Judges.
 RALPH B. GUY, Jr., Senior Circuit Judge:
 
 
 1
 On appeal, plaintiffs ask this court to reverse the district court's grant of summary judgment in favor of defendants Resolution Trust Corporation ("RTC"), CenTrust Bank ("CenTrust"), CenTrust Federal Savings Bank and Citibank.[1] In granting summary judgment, the court determined that RTC, as conservator of CenTrust, properly repudiated a contract in which CenTrust was a party. We determine that summary judgment was appropriately granted, and therefore we affirm.
 
 I.
 
 2
 On February 2, 1990, the RTC was appointed conservator of CenTrust. As part of his duties, Kurt Wierschem, RTC's managing agent for CenTrust, reviewed a contract between the law firm of Bailey Gerstein Carhart Rashkind Dresnick & Rippingille (the "Law Firm" or "Counsel") and CenTrust. Under the contract between the Law Firm and CenTrust (the Contract or Agreement),[2] entitled "CenTrust Savings Bank Directors and Officers Indemnity Agreement," CenTrust had deposited over $11 million in assets in an account to be used for indemnification purposes to fund legal fees and any damage awards resulting from claims made against its officers or directors (who are referred to in the Agreement as "Agents").[3] Section 2(a) of the Agreement. The fund was held for the "sole benefit of the Bank [CenTrust] and the Agents."[4] CenTrust retained power over investment decisions of the assets comprising the fund. It was free to remove all monies in the fund unless it had been notified of a claim against its Agents; thereafter, withdrawals required a two-thirds approval by the Agents.
 
 
 3
 Under the Agreement, the Law Firm was authorized to provide legal representation to CenTrust's officers and directors if claims were made. The Law Firm was to bill CenTrust for the legal services on a monthly basis. If CenTrust failed to pay any statement within 75 days following receipt of the statement, the Law Firm could charge against the fund for the amount owed. The Law Firm also agreed to oversee the fund which was kept at Citibank in a trust account entitled "CenTrust Savings & Loan Association of Miami, Bailey, Gerstein, Carhart, Rashkind, Dresnick & Rippingille Tr. A/C for the Benefit of CenTrust Bk Tr Agents Under/Agree 4/07/89."
 
 
 4
 Two days after RTC became conservator, Wierschem notified the Law Firm that the RTC had determined the contract was burdensome and the RTC was repudiating the Contract pursuant to RTC's authority under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). He further requested that the Law Firm return the assets contained in the fund.[5]
 
 
 5
 Plaintiffs brought this action seeking declaratory and injunctive relief under the Agreement. Defendant RTC filed a counterclaim against plaintiffs and a cross-claim against Citibank. In count 1 of that counterclaim and cross-claim, RTC sought a declaration that it had properly repudiated the Contract. RTC further requested the court to direct the counter-defendants and Citibank to return the fund assets to the RTC. The parties filed cross-motions for summary judgment on plaintiffs' claims and on count 1 of RTC's counterclaim and cross-claim. The district court found against plaintiffs on their claims and in favor of the RTC on count 1 of its counterclaim and cross-claim. See Gibson v. RTC, 750 F.Supp. 1565 (S.D.Fla.1990). The court declared that the RTC's repudiation was proper, that the assets contained in the Citibank account belonged to the RTC, and directed Citibank to follow the RTC's instructions as to disposition of the assets in the account. Plaintiffs now appeal.
 
 II.
 
 6
 We review a district court's grant of summary judgment under a de novo standard of review. E.g., Zipperer v. City of Fort Myers, 41 F.3d 619, 622 (11th Cir.1995). Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). In this case, plaintiffs and RTC have both moved for summary judgment, claiming that no material facts are disputed.
 
 
 7
 Congress enacted FIRREA in 1989 in response to the growing crisis in the nation's banking and savings and loan industries. The statute authorizes appointment of a federally-created entity, in this case, the RTC, as conservator or receiver of a failing or failed insured institution. The law provides the RTC with broad powers in its roles as conservator and receiver. Among those powers is the power to take over assets and operate the insured depositary institution, collect obligations and money due the institution, perform the functions of the institution consistent with its appointment as receiver or conservator, and preserve and conserve assets and property of the institution. See 12 U.S.C. Sec. 1821(d)(2)(B). Once an institution has been placed in receivership, the RTC has the power to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution." See 12 U.S.C. Sec. 1821(d)(2)(E); see also In re Landmark Land Co. of Oklahoma, Inc., 973 F.2d 283, 288 (4th Cir.1992) ("The objective of the RTC is to get as much money as it can from the sale or other disposition of the failed institutions or their assets").
 
 
 8
 Under FIRREA, to help RTC achieve its mandate of maximizing recovery on thrift assets, Congress has empowered the RTC to "disaffirm or repudiate any contract" the performance of which is "burdensome" and which disaffirmance or repudiation promotes the "orderly administration of the institution's affairs." 12 U.S.C. Sec. 1821(e)(1). Upon repudiation of an agreement, a claimant is entitled to actual direct compensatory damages. 12 U.S.C. Sec. 1821(e)(3)(A). Damages for lost profits or opportunity are not recoverable. See id. at Sec. 1821(d)(3)(B)(ii).
 
 
 9
 In this case, the managing agent determined that CenTrust's obligation to pay future legal expenses that might be incurred in defending its officers and directors would be burdensome for CenTrust now that it was in receivership. The determination of the burdensomeness of a contract is committed to the discretion of the RTC. 12 U.S.C. Sec. 1821(e). See, e.g., 1185 Ave. of the Americas Assocs. v. RTC, 22 F.3d 494, 498 (2d Cir.1994) (RTC had discretion to assume that a $7 million obligation to pay future rents was burdensome and to repudiate lease). Plaintiffs argue that, because the officers and directors have performed their services to CenTrust, CenTrust remains obligated under the Agreement.
 
 
 10
 Continuing to argue that the RTC's repudiation of the contract was improper, plaintiffs raise six issues on appeal: (1) the Fund is not the property of CenTrust but rather that of the officers and directors as the Agreement constituted an escrow or guaranty agreement; (2) the RTC is barred under FIRREA from recovering the assets in the fund because the officers and directors have a perfected security interest in the fund; (3) the Agreement is not an executory contract, and therefore FIRREA's repudiation provision does not apply; (4) the RTC is barred under the doctrine of promissory estoppel from repudiation; (5) the Takings and Due Process Clauses of the Fifth Amendment prohibit repudiation since plaintiffs have a vested right in the fund; and (6) the RTC could not act because it was named conservator by an unconstitutionally appointed director. We address these arguments in turn.
 
 A. Fund Ownership
 
 11
 Plaintiffs claim that the fund was the property of the officers and directors as the Agreement constituted an escrow or guaranty agreement.[6] Under Florida law, an escrow is established by "an instrument embodying conditions mutually beneficial to both parties ... and it must be communicated to and deposited with a third party." Aberbach v. Wekiva Assocs., 735 F.Supp. 1032, 1035 (S.D.Fla.1990) (quoting Smith v. Macbeth, 119 Fla. 796, 161 So. 721, 724 (1935)). The third party must not itself be involved in the transaction. E.g., Fleischman v. Department of Professional Regulation, 441 So.2d 1121, 1123 (Fla. 3d Dist.Ct.App.1983). Upon delivery of the res to a third person in escrow, the grantor by his act of delivery loses all control over the res. E.g., Aberbach, 735 F.Supp. at 1035.
 
 
 12
 The facts in this case do not support the contention that the Agreement was an escrow agreement. The directors and officers were not parties to the Agreement; the Law Firm, who held the fund in a trust account, was not a disinterested third party to the Agreement but rather a party to the Contract; moreover, the word "escrow" never appears in the Agreement. Nor did CenTrust lose control over the fund; it retained the rights to add, substitute, value, invest, sell, dispose of, and audit fund assets.[7]
 
 B. Security Interest
 
 13
 Plaintiffs also claim that the directors and officers allegedly had a legally enforceable security interest in the full amount of the fund. In support of their argument, plaintiffs point out that under 12 U.S.C. Sec. 1821(e)(11), the RTC may not avoid "any legally enforceable or perfected security interest."
 
 
 14
 Under Florida law a security interest is an "interest in personal property or fixtures which secures payment or performance of an obligation." See Fla.Stat.Ann. Sec. 671.201(37) (West 1995). To create a security interest, parties need only evidence an intent to establish a security agreement. Looney v. Nuss, 545 F.2d 916, 918 (5th Cir.), cert. denied, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977); see Fla.Stat.Ann. Sec. 679.102 cmt. 1 (West 1995). No particular words need be used to evidence the security interest. Morey Mach. Co. v. Great W. Indus. Mach. Co., 507 F.2d 987, 989-90 (5th Cir.1975) (applying Florida law). Rather, the language of the instrument must simply " 'lead[ ] to the logical conclusion that it was the intention of the parties that a security interest be created.' " Sommers v. IBM, 640 F.2d 686, 689 (5th Cir.1981) (quoting Mitchell v. Shepherd Mall State Bank, 458 F.2d 700, 703 (10th Cir.1972)).
 
 
 15
 Unfortunately for plaintiffs, the Agreement contradicts plaintiffs' assertions that the Agreement creates a security interest in the fund in favor of plaintiffs. The only security interest created in the Agreement is that in favor of Counsel: "To the extent and in the amount of any unpaid Statements ... of Counsel or any substitute counsel ... Counsel shall have a first lien upon the Assets in the Fund for its benefit and the benefit of any such substitute counsel[.]" Section 2(d) of the Agreement.[8] The Agreement does not mention any other security interests in favor of plaintiffs or others, rather it expressly bars them: "To the maximum extent permissible by law, except for the lien granted in Section 2(d) none of the Assets in the Fund shall be attachable or chargeable for the individual debts or obligations of the Bank or any of the Agents." Section 7(j) of the Agreement.[9] Furthermore, the express language creating Counsel's security interest shows that the drafters of the Agreement knew how to create a security interest in favor of the officers and directors if they had wanted to do so.
 
 
 16
 Plaintiffs' authority in support of its argument is distinguishable. In Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.), 121 B.R. 562 (Bankr.N.D.Iowa 1990), there was abundant evidence, including repeated references in the agreement and by the parties to "security," to conclude that the parties intended to create a security interest in favor of the insurance commissioner. Id. at 571-72. The "no attachment" clause to the security agreement further evidenced the insurance commissioner's effort to protect its collateral. Id. at 572.
 
 
 17
 Even if the plaintiffs had a security interest, their interest would not be legally enforceable. The Uniform Commercial Code, as adopted in Florida, provides that a security interest is legally enforceable or "perfected" (1) if the secured party possesses the collateral, or the debtor has signed a security agreement containing a description of the collateral; (2) value has been given by the secured party; and (3) the debtor has rights in the collateral. Fla.Stat.Ann. Sec. 679.203 (West 1995); Hartzog v. Dixon, 366 So.2d 848, 850 (Fla. 1st Dist.Ct.App.1979). In this case, the officers and directors did not possess the collateral, rather the fund was held by the Law Firm. Moreover, since we determined that the Law Firm was not an escrow holder for the officers and directors, the Law Firm's possession of the alleged collateral could not be imputed to plaintiffs. Cf. Fla.Stat.Ann. Sec. 679.305 & cmt. 2 (West 1995) (security interest may be perfected by an escrow agent's or bailee's possession of the collateral). The Agreement cannot be considered a security agreement because it expressly prohibits assets of the fund from being "attachable or chargeable for the individual debts or obligations of the Bank or any of the [officers or directors]." Section 7(j) of the Agreement. Plaintiffs' failure to establish even the first element of a legally enforceable security interest obviates the need for discussion of the remaining elements.
 
 
 18
 At the time of repudiation, the only security interest that could have attached was for Counsel's past unpaid legal services, which RTC paid. As compensatory damages are limited to "actual direct compensatory damages" under 12 U.S.C. Sec. 1821(e)(3), Counsel could not seek damages relating to services not yet rendered. See Morton v. Arlington Heights Fed. Sav. & Loan Ass'n, 836 F.Supp. 477, 487 (N.D.Ill.1993). Thus a party's actual direct compensatory damages provides a cap on the extent of its security interest. See Unisys Fin. Corp. v. RTC, 979 F.2d 609, 611 (7th Cir.1992) (creditor may only assert security interest to level necessary to assure collectibility of its claim, and any excess security could be assigned to other creditors). Since the Law Firm has been fully paid, there is no remaining claim on the fund as a security.
 
 C. Executory versus Non-Executory Contracts
 
 19
 Plaintiffs argue that the RTC is authorized under FIRREA to repudiate only executory contracts. Because, plaintiffs argue, the Agreement was not executory, the RTC's repudiation was improper.[10] Executory contracts have been characterized as those with "reciprocal remaining obligations." E.g., Gibson, 750 F.Supp. at 1569 (citing In re Brada Miller Freight Sys., Inc., 702 F.2d 890, 894 n. 10 (11th Cir.1983)); cf. Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1973) (defining an executory contract within the meaning of Bankruptcy Act as one involving mutual obligations "so far unperformed that the failure of either [party] to complete performance would constitute a material breach excusing the performance of the other"). Plaintiffs claim that at the time of repudiation the parties had already fully performed under the Agreement, CenTrust, by transferring the requisite assets and selecting counsel for the fund, and CenTrust's officers and directors, by providing their services to CenTrust.[11]
 
 
 20
 Plaintiffs' argument fails, however, as we cannot agree with their characterization of the Contract. The Agreement plainly requires Counsel to provide future legal services for the benefit of CenTrust's officers and directors, which performance will obligate CenTrust to pay. The only signatories to the Agreement are the Law Firm and CenTrust. In this case, the Law Firm has not provided legal services nor has it billed CenTrust for such unprovided services. In turn, Centrust has not paid for the Law Firm's services.[12]
 
 
 21
 Moreover, the Agreement makes plain that the existence of the fund does not relieve CenTrust from its future performance obligations:
 
 
 22
 [I]t is understood and agreed between CenTrust and [Law Firm] that Counsel and any substitute counsel will be rendering their services under this Agreement to [officers and directors] of CenTrust at CenTrust's request, and that CenTrust ... will be directly responsible for paying all Counsel's and substitute counsel's fees and costs incurred in rendering such services. Counsel's and substitute counsel's right to seek or obtain payment from the Fund shall not relieve CenTrust of its obligation ... to pay Counsel's and substitute counsel's fees and costs, nor shall it preclude Counsel or substitute counsel from taking any other action Counsel or substitute counsel deem appropriate to collect their fees and costs from CenTrust or other parties.
 
 
 23
 Section 3(f) of the Agreement.
 
 
 24
 Courts have previously addressed the RTC's right to repudiate contracts by failing financial institutions attempting to earmark assets to fund future litigation involving officers and directors. For example, in FSLIC v. Angell, Holmes & Lea, 838 F.2d 395 (9th Cir.), cert. denied, Van Voorhis & Skaggs v. FSLIC, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 100 (1988), a savings and loan, anticipating financial failure and a federal takeover, transferred $500,000 in advance legal fees to two law firms. The retainer agreements provided that the fees were deemed earned upon payment and non-refundable. The Ninth Circuit held that the firms had to return the advance payments, determining that the payments for future legal services were not assets belonging to the bank's prior management, but rather assets of the institutions belonging to the creditors and depositors. 838 F.2d at 396; accord Haralson v. Federal Home Loan Bank Bd., 1986 Fed.Banking L.Rep. (CCH) p 86,679 at 91,883-84 (D.D.C. Sept. 9, 1986) (requiring law firm to return advance payments for legal services and noting "[u]nder plaintiffs' theory the former management of an [institution] would be able to virtually dissipate the assets of an [institution] under the guise of paying advance legal fees.").
 
 
 25
 The rationales of Angell, Holmes and Haralson apply with even greater force to the facts in this case. For example, the parties did not designate any definite sum for fees covered under the Agreement. Moreover, there is no suggestion that the fees were to be pre-paid.
 
 
 26
 Plaintiff's authority is distinguishable. For example, in Dolphin Titan Int'l v. Gray & Co. (In re Dolphin Titan Int'l), 93 B.R. 508 (Bankr.S.D.Tex.1988), the debtor prior to bankruptcy had terminated its insurance contract for worker's compensation coverage. There the loss fund created under the insurance policy was fully paid, and the fund was managed by the insurance company. The only remaining duties of the parties under the contract were to pay for claims.
 
 D. Promissory Estoppel
 
 27
 Plaintiffs argue that the RTC "stands in the shoes" of CenTrust and, as such, is estopped from repudiating the Agreement. They contend that (1) CenTrust contractually promised plaintiffs that once it received notice of claims the fund would not be invaded or terminated without the prior written consent of two-thirds of the affected beneficiaries; (2) CenTrust, in making that promise, reasonably expected to induce action or forbearance of a substantial character on the part of its officers and directors, namely that they continue to serve CenTrust; (3) plaintiffs relied on this promise in continuing to serve and their reliance was reasonable given CenTrust's reassurances; and (4) the repudiation has worked a harsh injustice, unjustly enriching defendants while exposing plaintiffs to financial ruin in expensive lawsuits arising out of their service, including some brought by the RTC.
 
 
 28
 In support of their argument, plaintiffs rely on O'Melveny & Myers v. FDIC, --- U.S. ----, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). O'Melveny involved a suit by the FDIC against former counsel for the failed bank alleging malpractice and breach of fiduciary duty in connection with public offerings. The defendant raised the defense of knowledge of any alleged fraud by former bank officers. The district court imputed the knowledge to the FDIC. The Ninth Circuit reversed, concluding that the defense of knowledge was not imputable to the FDIC. On certiorari, the Court considered whether state or federal law applied in determining the tort liability of attorneys who provided services to the bank. In that case, the Court construed 12 U.S.C. Sec. 1821(d)(2)(A), which states that "the [FDIC] shall ... by operation of law, succeed to--(i) all rights, titles, powers, and privileges of the insured depository institution," as indicating that the FDIC as receiver " 'steps into the shoes' " of the failed savings and loan. --- U.S. at ----, 114 S.Ct. at 2054 (quoting Coit Independence Joint Venture v. FSLIC, 489 U.S. 561, 585, 109 S.Ct. 1361, 1374, 103 L.Ed.2d 602 (1989)). Moreover, the Court held that individual state law governed whether any legal defenses such as knowledge were imputable to the FDIC as receiver and remanded.
 
 
 29
 We find O'Melveny distinguishable. O'Melveny involved a state law cause of action brought by the FDIC. In contrast, in the instant case, the RTC as receiver seeks to exercise its authority under federal law to repudiate the Agreement pursuant to 12 U.S.C. Sec. 1821(e). In such an instance, federal law, not state law, governs. See RTC v. Diamond, 45 F.3d 665, 670-71 (2d Cir.1995) (when federal receiver steps into shoes of failed institution to pursue federal cause of action, federal law governs that cause of action), petition for cert. filed, 63 U.S.L.W. 3722 (U.S. Mar. 2, 1995) (No. 94-1564).
 
 
 30
 A defense of equitable estoppel to a federal cause of action will lie against the government only in the most extreme circumstances. Feldman v. CIR, 20 F.3d 1128, 1134 (11th Cir.1994) (citing OPM v. Richmond, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990)). The burden on a private party seeking to estop the government is heavy, and that party must, at a minimum, demonstrate the traditional elements of estoppel. Feldman, 20 F.3d at 1134; see also Organized Fishermen v. Hodel, 775 F.2d 1544, 1549 (11th Cir.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986) (citing Heckler v. Community Health Serv., 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984) (estoppel lies upon misrepresentation of fact and reasonable reliance on that misrepresentation)).
 
 
 31
 In applying traditional concepts of estoppel, we need only address the element of reliance to determine that estoppel is inappropriate in these circumstances because we find plaintiffs' reliance on any promise by CenTrust regarding the fund to be unreasonable.[13] The record demonstrates that the board of directors of CenTrust had been repeatedly advised by CenTrust's counsel that the government might attempt to repudiate the Agreement. Furthermore, plaintiffs are legally presumed to know the likelihood of repudiation. Federal regulations have long authorized the conservator or receiver of a failed thrift institution to disaffirm or repudiate burdensome contracts. See, e.g., 12 C.F.R. Sec. 388.3(c)(3) (1990); see also United States v. Vonderau, 837 F.2d 1540, 1542 (11th Cir.1988) (parties subject to federal regulation are charged with knowing their contents).
 
 
 32
 Finally, we note that promissory estoppel is only appropriate when "injustice can be avoided only by enforcement of the promise." E.g., Frech v. Pensacola S.S. Ass'n, 903 F.2d 1471, 1476 (11th Cir.1990) (quoting Restatement (Second) of Contracts, Sec. 90(1) (1979)). Plaintiffs acknowledge that the Agreement was purposely designed to give them preferential treatment over other creditors: "Reducing [plaintiffs] to the status of general creditors of CenTrust is precisely the fate that the parties to the Agreement sought to avoid in establishing the Fund in the first place." In the large scheme of RTC's efforts to stem the financial hemorrhaging of the savings and loan industry, plaintiffs' inability to preserve their preferential position, negotiated at least in part while the institution to which they served was failing, does not demonstrate such injustice that their alternative remedies under state law regarding indemnification of officers and directors by corporations should be viewed as insufficient to require estoppel of RTC's action in this case.[14]
 
 E. Fifth Amendment
 
 33
 Plaintiffs also argue that the Takings and Due Process Clauses of the Fifth Amendment prohibit repudiation. That amendment provides in pertinent part: "No person shall ... be deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation." Because we have determined that the plaintiffs do not own the fund, there is no basis for these claims.[15]
 
 F. Appointments Clause
 
 34
 Finally, plaintiffs claim that RTC's actions were taken pursuant to an unconstitutional appointment. Plaintiffs allege that the appointments of certain directors of the Office of Thrift Supervision (OTS) violated the Appointments Clause of the Constitution and therefore these directors' subsequent appointments of the RTC as conservator and receiver of CenTrust and all resulting actions taken by RTC in those roles are unauthorized and unconstitutional. In support of their contention, plaintiffs cite Olympic Federal Savings and Loan v. Director, Office of Thrift Supervision, 732 F.Supp. 1183 (D.D.C.), appeal dismissed and remanded by 903 F.2d 837 (D.C.Cir.1990) (the injunctive relief granted was rendered moot by the constitutional subsequent appointment of the OTS Director). The district court in Olympic held that the appointments of Danny Wall and Salvatore Martoche as Directors of the OTS violated the Appointments Clause of the Constitution. U.S. Const. art. II, Sec. 2, cl. 2. Accordingly, the court concluded Wall and Martoche lacked authority to appoint a conservator to take over a savings and loan institution. 732 F.Supp. at 1200.
 
 
 35
 We need not reach the merits of plaintiffs' claim, however, as we find that plaintiffs' claim is untimely. Under 12 U.S.C. Sec. 1464(d)(2)(B), objections to the appointment of a conservator must be commenced within 30 days of the appointment. That provision is the exclusive mechanism for challenging the appointment of a conservator. 12 U.S.C. Sec. 1464(d)(2)(D) (providing that "[e]xcept as otherwise provided in this subsection, no court may take any action ... to restrain or affect the exercise of powers or functions of a conservator"). See also Haralson v. Federal Home Loan Bank Bd., 837 F.2d 1123, 1125 (D.C.Cir.1988) (construing predecessor to Sec. 1464(d)(2)(D)).
 
 
 36
 In this case, the RTC was appointed on February 2, 1990. Plaintiffs did not raise this issue until more than 30 days later, when, on April 20, 1990, they amended their complaint to assert this claim.
 
 
 37
 Plaintiffs contend that their claim is timely under the relation-back doctrine. Under that doctrine, amendments to complaints relate back to the original filing date when the issue was raised in the original complaint. In this case, however, the Appointments Clause issue had not been raised in plaintiffs' original complaint filed within 30 days of RTC's appointment as conservator. Therefore, the relation-back doctrine does not apply. See Moore v. Baker, 989 F.2d 1129, 1131 (11th Cir.1993) (issues alleged for the first time in amended complaint do not relate back; recovery on those issues is barred by statute of limitations if amended complaint was filed after statute of limitations has run).
 
 
 38
 AFFIRMED.
 
 
 
 *
 Honorable Ralph B. Guy, Jr., Senior U.S. Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation
 
 
 [1]
 Plaintiffs F. Lee Bailey, Richard E. Gerstein, Edward A. Carhart, Paul M. Rashkind, Ronald D. Dresnick, and Bonnie Rippingille, d/b/a Bailey Gerstein Carhart Rashkind Dresnick & Rippingille, a Florida law firm, did not file a separate brief in this appeal. Nor does appellants' brief set out any independent theories on appeal respecting the law firm's rights on appeal. Therefore our analysis addresses the theories on appeal as raised by plaintiffs, Thelma V.A. Gibson and Catherine H. Fahringer, former directors of CenTrust Bank
 
 
 [2]
 The contract was originally entered into between CenTrust and the law firm of Sparber, Shevin, Shapo, Heilbronner & Book, P.A., in August 1986. The agreement was first amended on January 8, 1987, and again on April 7, 1989. At the time of the second amendment, the Sparber Shevin law firm resigned as counsel and was replaced by the law firm of Squire, Sanders & Dempsey. On January 24, 1990, Squire, Sanders & Dempsey assigned its rights as a party to the second amended agreement to the Bailey Gerstein law firm
 
 
 [3]
 In April 1989, three weeks after the Federal Home Loan Bank Board put CenTrust and all of its directors on written notice that CenTrust was a "severely troubled institution" and would be subject to increased regulatory supervision, the Agreement was amended to allow the fund to be used for payments of any judgments against officers or directors. At the same time, a provision was added to the Agreement providing that CenTrust could not terminate the Agreement for three years if there had been a "change of control," defined as a regulatory takeover of the bank. See Sections 6(a) and (b) of the Agreement
 
 
 [4]
 The Agents were not signatories to the Contract
 
 
 [5]
 The Law Firm refused to comply because as a predicate to the fund's termination under the Agreement any such demand on behalf of CenTrust had to be accompanied by the consent of two-thirds of the directors and officers who could be adversely affected by the surrender of the fund. RTC had not obtained the directors' and officers' consent prior to presenting its demand
 
 
 [6]
 Defendants argue that plaintiffs have raised these issues for the first time on appeal, and therefore we should not consider them. See, e.g., United States v. Southern Fabricating Co., 764 F.2d 780, 781 (11th Cir.1985) (court of appeals "will not consider a legal issue or theory raised for the first time on appeal"). This court will consider issues raised for the first time on appeal only under "special circumstances." Johnson v. Smith, 696 F.2d 1334, 1338 (11th Cir.1983). Upon review of the record, we find that plaintiffs did raise the escrow argument below and therefore we will address that argument. We find no support, nor do plaintiffs provide any, however, to suggest that the guaranty argument was raised below. Plaintiffs do not suggest that any special circumstances exist to warrant our consideration of the issue. Therefore, we do not address plaintiffs' guaranty argument
 
 
 [7]
 Even if the Agreement were to be construed as an escrow agreement, the conditions precedent required to transfer interest in the fund's assets to the Law Firm never occurred. An escrow agreement transfers title upon the occurrence of specified conditions and those conditions must have occurred. Plaintiffs claim that under Section 6(a)(ii) of the Agreement, title was transferred when the first claim was asserted against an officer or director of CenTrust. That section provides that CenTrust will not withdraw assets from the fund without prior consent of those officers and directors against whom claims have been made "without the prior written consent of at least 66 2/3% of all Agents who reasonably would be parties to any of the following Claims, CenTrust shall not have the right to terminate this Agreement or to withdraw any amounts from the Fund if at the time it desires to do so...." Section 6 clearly limits CenTrust's termination rights under the Agreement; plaintiffs fail to show, however, how such language reduces CenTrust's equitable or legal interests in the fund or transfers any rights in the fund to the Law Firm or to the directors and officers
 
 
 [8]
 Statements refers to monthly statements of past, unpaid legal services. See Section 3(b)
 
 
 [9]
 Plaintiffs argue that the Agreement's use of the phrase "first lien" implies the presence of at least a "second lien" in the Agreement. Plaintiffs argument is unavailing. The term, "first lien," is a legal term of art meaning a lien which takes priority or precedence over other charges or encumbrances upon the same piece of property and which must be satisfied before such other charges are entitled to participate in the proceeds of the property's sale. See Black's Law Dictionary (6th ed. 1990)
 
 
 [10]
 The RTC takes the position that it can repudiate non-executory contracts under FIRREA. Plaintiffs address this argument in their brief on appeal in supporting their position that the RTC improperly repudiated a non-executory agreement. Because based on our analysis infra we conclude that the Agreement is executory, we do not address whether FIRREA allows RTC to repudiate non-executory contracts
 
 
 [11]
 Plaintiffs' claim presupposes that CenTrust's officers and directors were parties to the Agreement
 
 
 [12]
 To the extent services had been rendered by predecessor law firms to the Agreement, there is no dispute that RTC has paid all outstanding statements for those legal services that had been submitted for payment prior to repudiation
 
 
 [13]
 In this regard, the result is the same whether O'Melveny applies or not because under either federal law or state law reasonable reliance is a required element of the defense of equitable estoppel. Compare Heckler, 467 U.S. at 59, 104 S.Ct. at 2223 with W.R. Grace & Co. v. Geodata Servs., 547 So.2d 919, 924 (Fla.1989)
 
 
 [14]
 The RTC characterizes the fund as an attempt by plaintiffs to strip CenTrust of its assets, and in its counterclaim the RTC specifically alleged fraudulent conveyance. That issue as well as plaintiffs' right to indemnification under Florida law also pled in RTC's counterclaim are not before this court. The district court stayed discovery on those issues after plaintiffs moved for summary judgment on the repudiation issue
 
 
 [15]
 To the extent that the Law Firm had a secured interest in the fund for past, unpaid legal fees, adequate compensation has been made, as the RTC paid the outstanding balance. See Unisys, 979 F.2d at 612 ("[t]here is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected" by FIRREA damages) (quoting In re James Wilson Assocs., 965 F.2d 160, 171 (7th Cir.1992))